[No. C032818. Third Dist. Jan. 30, 2001.]

THE PEOPLE, Plaintiff and Appellant, v.
PRAKASH VALLABHDAS PARMAR et al., Defendants and
Respondents.

**COUNSEL**

Jan Scully, District Attorney, and Albert C. Locher, Assistant Chief Deputy District Attorney, for Plaintiff and Appellant.

Barry & Randolph, Michelle J. Gray and Adrian L. Randolph for Sacramento Housing and Redevelopment Agency as Amicus Curiae on behalf of Plaintiff and Appellant.

Paulino Duran, Public Defender, and Michael R. Nelson, Assistant Public Defender, for Defendant and Respondent Rosemary Parmar.

C. Emmett Mahle for Defendant and Respondent Prakash Vallabhdas Parmar.

**OPINION**

**SCOTLAND, P. J.**—Upon certification by the Appellate Division of the Sacramento County Superior Court, we ordered this appeal transferred to this court in order to settle an important question of law. (Pen. Code, § 1471.)

The defendants, Prakash Vallabhdas Parmar and Rosemary Parmar, are facing a 250-count misdemeanor complaint arising out of their ownership and operation of two contiguous motels on Auburn Boulevard in Sacramento County. On defendants' motion, the trial court entered an order disqualifying Deputy District Attorney Rita-Jane Spillane, her immediate supervisors, and the office unit of which she is a part from prosecuting the action. (Pen. Code, § 1424, subd. (a)(1).) In ruling on the disqualification motion, the court concluded that a contract between the district attorney's office and the Sacramento Housing and Redevelopment Agency (SHRA), by which SHRA

partially funds a position in the district attorney's office for the purpose of prosecuting nuisance actions, is contrary to public policy and void.

As we shall explain, we agree with the district attorney that the contract is not contrary to public policy, and that the evidence is insufficient to support the disqualification order. Accordingly, we will reverse and remand for further proceedings.

### FACTUAL AND PROCEDURAL BACKGROUND

SHRA is a joint powers agency of the City of Sacramento and the County of Sacramento. SHRA serves as both housing authority and redevelopment agency for the city and the county. In performing its function, SHRA coordinates its actions with a variety of state and local entities. To encourage citizen participation, it has created local project area committees in which residents, community organizations, property owners, and business owners from affected areas can meet and make recommendations.

A major portion of SHRA's funding is derived from the federal Department of Housing and Urban Development (HUD). The HUD funds administered by SHRA include Community Development Block Grant (CDBG) funds. (42 U.S.C. § 5301 et seq.) The county is a CDBG entitlement jurisdiction, and it has delegated to SHRA the responsibility for administering the CDBG funds.

The purposes of the CDBG program include the construction and improvement of the infrastructure in low/moderate income areas; the improvement and enhancement of the livability of low/moderate income neighborhoods; the expansion of economic opportunities; the provision of decent housing and suitable living environments; and the elimination of slums and blight.

The statutorily permitted uses of CDBG funds include "the elimination of conditions which are detrimental to health, safety, and public welfare, through code enforcement, demolition, interim rehabilitation assistance, and related activities." (42 U.S.C. § 5301(c)(2).)

In 1996, SHRA determined that some of the county's CDBG funds should be used to partially fund a position in the district attorney's office to concentrate on nuisance abatement in targeted areas. The county board of supervisors and HUD approved this use of CDBG funds. According to the district attorney, she "has long recognized the need to address complaints concerning problem properties. Unfortunately, the financial resources have

not been available to add a prosecutor to deal solely with nuisance abatement cases. This transfer of funds from SHRA, as approved by the Board of Supervisors, has now made the addition of this position possible."

The district attorney and SHRA entered into an agreement. SHRA agreed to fund one-half of a prosecutorial position. The district attorney agreed: (1) "The assigned Deputy District Attorney will focus primarily on Nuisance Abatement cases in SHRA targeted areas within the County of Sacramento to pursue civil and criminal actions as authorized by law. The Deputy District Attorney will seek all legal and equitable remedies available to the District Attorney under law on individuals who are found to be in violation of Nuisance statutes." (2) "The assigned Deputy District Attorney will file cases under authority granted in California State Health and Safety Code 11570 [drug-house abatement] and Penal Code Section 186.22a [street gang abatement] and will prosecute such other actions as the District Attorney is empowered to file by law." (3) "The assigned Deputy District Attorney will target specific properties, accumulate evidence and documentation supporting the alleged nuisance activity, evaluate what remedies are sought, and file suit if response by landowner is inadequate. The Deputy District Attorney will formulate and implement procedures, guidelines and protocols between agencies." (4) "The assigned Deputy District Attorney will meet with Agency staff, County staff, City staff, [Sacramento County Sheriff's Department] and [Sacramento Police Department] officers and all and any other multi-agency staff as necessary for case development. Monthly meetings will be held between the Agency and the District Attorney's Office to target problem properties, coordinate joint operations between agencies."

Deputy District Attorney Spillane was assigned to the position created after execution of the agreement.

SHRA targeted areas include areas that have been designated redevelopment areas pursuant to the Community Redevelopment Law. (Health & Saf. Code, § 33000 et seq.) Redevelopment areas are "blighted areas which constitute physical and economic liabilities, requiring redevelopment in the interest of the health, safety, and general welfare of the people of these communities and of the state." (Health & Saf. Code, § 33030.) It is the policy of the state to utilize all appropriate means to promote the sound development and redevelopment of such areas. (Health & Saf. Code, § 33037.)

One of SHRA's targeted areas, and the area of concern here, is the Auburn Boulevard Redevelopment Project. That project area is a narrow strip of about 173 acres along Interstate 80. Auburn Boulevard was once a major

roadway into and out of the city. At that time, the project area was a commercial strip that included motels and travel/trailer courts. With the construction of Interstate 80 in the mid-1960's, the economic viability of these businesses began to wane. The businesses began to shift away from temporary residential/shelter uses to longer-term residential use, although they were not designed and in many cases were not fit for such long-term use. This led to a variety of problems, including overcrowding, with insufficient open space and recreational areas, and aging, obsolete, and deteriorating buildings and structures. By 1992, when the area was designated as a redevelopment area, crime primarily centered around prostitution and drugs had become a firmly rooted attribute of the area.

Two of the problem motels in the Auburn Boulevard Redevelopment Project are the Rolling Green and the Ritz. Defendants, through their corporation Amit Investments, Inc., acquired the Rolling Green in 1994 and the Ritz in 1996. From the fall of 1996 through the fall of 1997, inspections revealed numerous code violations in the Rolling Green and Ritz motels. Defendants were given notice of the violations.

Eventually, with the one-year statute of limitations running down on some of the criminal violations, Spillane filed a 20-count misdemeanor complaint against defendants. The complaint later was amended to allege 250 misdemeanor violations, to wit, 1 count of criminal public nuisance, 116 counts of substandard housing conditions, 31 counts of renting a substandard dwelling, 63 counts of failing to obey an order to correct substandard conditions, 28 counts of renting a dwelling that has been the subject of a substandard order without first obtaining a county inspection, 4 counts of failing to acquire proper permits, and 7 counts for the accumulation of trash and garbage. For purposes of the hearing on the motion to disqualify Spillane from prosecuting the action, the parties stipulated that there is probable cause for each of the charged violations.

Much of the evidence at the disqualification hearing was directed toward Spillane's conduct in the discharge of her duties. It was shown that on various occasions she attended meetings of the Auburn Boulevard Project Area Committee. She went, as an observer, on some of the inspections of the properties with representatives of the sheriff's department, the building department, the county environmental management division, the utilities company, and others. She exchanged information with the county sheriff's department, the county probation department, the county counsel, the city police department, the city counsel, the city social nuisance program, and others. She maintained frequent contact with Elizabeth Wolf, a SHRA associate planner who served as coordinator of the district attorney program.

When Spillane began her assignment, she discussed the problems associated with nuisance actions with attorneys from various other local governments. She learned that frequently, as a response to enforcement action, a nuisance property owner will file for bankruptcy. This usually causes enforcement authorities to back away for fear of interfering with the federal proceeding.

In March 1997, in the face of enforcement action, defendants caused Amit Investments, Inc., to file for bankruptcy protection. Spillane determined that she did not want the interests of the county, and of the neighborhood and community surrounding the Rolling Green and Ritz motels, to be compromised or jeopardized out of ignorance. In August 1997, Spillane contacted Donna Tamanaha, United States Trustee in the bankruptcy proceeding. Among other things, she told Tamanaha that defendant's properties had numerous code violation citations that had not been paid, and she asked whether the properties would be dischargeable in bankruptcy. At or about that time, Tamanaha had filed a motion to convert the bankruptcy action from a chapter 11 (reorganization) to a chapter 7 (liquidation) proceeding. The motion was based upon defendants' failure to file their June monthly report or to pay their first and second quarterly trustee's fees. The discussion with Spillane further convinced Tamanaha that the matter should be converted to a liquidation proceeding. Eventually, based upon the report of an examiner, the case was converted to a proceeding for liquidation.

Based upon this scenario, the trial court concluded that the SHRA contract with the district attorney violates public policy and is void. The court further determined that Spillane, her immediate supervisors, and the office unit of which she is a part must be disqualified from prosecuting the action. The court declined to disqualify the entire office of the district attorney.

The district attorney appealed to the Appellate Division of the Sacramento County Superior Court. (Pen. Code, § 1466, subd. (1)(A) [authorizing the People to appeal to the appellate division of the superior court from an order disqualifying the district attorney in a misdemeanor case].) Finding "the issues presented are not only issues of first impression, but are issues of widespread interest whose resolution has the potential for significant impact on local governments, the public agencies that contract with local governments, and district attorneys throughout the state," the appellate division of the superior court certified the case for transfer to this court pursuant to California Rules of Court, rule 63(a). We then ordered the case transferred to settle an important question of law. (Pen. Code, § 1471.)

DISCUSSION

I

*Jurisdiction Over the Contract*

The district attorney, supported by SHRA as amicus curiae, argues that, because the County of Sacramento and SHRA were not parties to the motion to disqualify, the trial court did not have the authority to declare the SHRA contract void. We disagree.

The failure to join so-called indispensable parties is not a jurisdictional defect in the fundamental sense. (*McKeon v. Hastings College* (1986) 185 Cal.App.3d 877, 890 [230 Cal.Rptr. 176].) While in an appropriate case a trial court may, for reasons of equity and convenience, decline to proceed in the absence of an indispensable party, it is not without the jurisdiction to do so. (*Ibid.*) "Although the court has no jurisdiction of the absent party, and its judgment cannot bind him, the court does have jurisdiction of the existing parties and it has the power to make a judgment affecting their interests." (*Kraus v. Willow Park Public Golf Course* (1977) 73 Cal.App.3d 354, 368 [140 Cal.Rptr. 744].)

In this case, the trial court had both subject matter jurisdiction and jurisdiction over the parties to the motion to disqualify. The court had the authority to resolve all questions necessary to the determination of that motion, including, insofar as relevant to the motion to disqualify, the validity of the SHRA contract. The court's decision was not directly binding upon the county and SHRA, since they were not parties to the proceeding. However, within the context of the motion to disqualify, the trial court had authority to consider the validity of the SHRA contract. Accordingly, we proceed to consideration of the merits of the appeal.

II

*The Standard of Review*

On appeal from a trial court's ruling on a motion to disqualify a district attorney from prosecuting a case, a reviewing court must determine whether there is substantial evidence to support the trial court's factual findings and, based on those findings, whether the trial court abused its discretion in ruling on the motion. (*People v. Breaux* (1991) 1 Cal.4th 281, 293-294 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

Abuse of discretion is established if, considering all of the circumstances before it, the trial court exceeded the bounds of reason. (*County of Alameda*

*v. Risby* (1994) 28 Cal.App.4th 1425, 1431 [34 Cal.Rptr.2d 333].) Of course, "[t]he scope of discretion always resides in the particular law being applied; action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an abuse of discretion." (*Choice-in-Education League v. Los Angeles Unified School Dist.* (1993) 17 Cal.App.4th 415, 422 [21 Cal.Rptr.2d 303]; see also *Continental Ins. Co. v. Superior Court* (1995) 32 Cal.App.4th 94, 108 [37 Cal.Rptr.2d 843].) ■■■ The principles of law applicable to a motion to disqualify the district attorney are as follows:

The district attorney is an executive officer exercising executive branch authority and generally is not subject to judicial supervision. (*People v. Birks* (1998) 19 Cal.4th 108, 134 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) A court does not have the authority to direct the executive's choice of a representative, but may disqualify a particular representative when his or her participation would taint the proceeding. (*People v. Superior Court (Greer)* (1977) 19 Cal.3d 255, 265 [137 Cal.Rptr. 476, 561 P.2d 1164].) In this respect, the Legislature has provided that a motion to disqualify may not be granted unless the evidence establishes a conflict of interest sufficient to render it unlikely that the defendant will receive a fair trial. (Pen. Code, § 1424, subd. (a)(1).)

■■■ A trial court's decision to disqualify a prosecutor may be found to be an abuse of discretion if the record does not establish a sufficient basis for invocation of the court's authority. Accordingly, we will review the record in light of applicable principles of law to determine whether defendants presented a sufficient legal basis to support an exercise of discretion. If the record does not establish a sufficient legal basis to support an exercise of discretion, the disqualification order must be considered an abuse of discretion. If a sufficient showing to support an exercise of discretion has been made, the trial court's order must stand unless it appears to exceed the bounds of reason in light of all of the circumstances presented.

## III

### *The Validity Of The Contract*

In ruling on the motion to disqualify Spillane from prosecuting this case, the trial court relied heavily upon the California Supreme Court's decision in *People v. Eubanks* (1996) 14 Cal.4th 580 [59 Cal.Rptr.2d 200, 927 P.2d 310] (*Eubanks*). In *Eubanks,* a software developer, Borland International (Borland), suspected a former employee of conveying internal information to a competitor, Symantec Corporation (Symantec). Search warrants were obtained, but the district attorney's office lacked personnel with the expertise

to search Symantec's computers and asked Borland to provide employees to assist. Borland did not want its employees exposed to Symantec secrets and suggested that independent consultants be used. Borland hired and paid one specialist, and the district attorney's office hired another. Borland agreed to pay for the services of the district attorney's specialist and did so after his bill was submitted to the district attorney and forwarded to Borland. The district attorney agreed to the procedure in part because the office was experiencing serious budgetary constraints in the fund used to pay professional and special witnesses. It also appeared that Borland paid a private service to transcribe audiotaped interviews of Borland employees after being told the investigation would be delayed indefinitely due to a clerical backlog in the district attorney's office. Ultimately, the former Borland employee and an officer of Symantec were charged with criminal offenses. Concluding that Borland's funding of the district attorney's investigation created a conflict of interest, the trial court granted the defendants' motion to disqualify the district attorney from prosecuting the case. The Court of Appeal reversed, and the Supreme Court granted review. (*Id.* at pp. 584-588.)

▮ *Eubanks* phrased the issue as "whether a crime victim's payment of substantial investigative expenses already incurred by the public prosecutor creates a disabling conflict of interest for the prosecutor, requiring his or her disqualification." (*Eubanks, supra,* 14 Cal.4th at p. 588.) The controlling authority is Penal Code section 1424, which establishes procedures for a motion to disqualify the district attorney and which provides in pertinent part: "The motion shall not be granted unless it is shown by the evidence that a conflict of interest exists such as would render it unlikely that the defendant would receive a fair trial." (See *Eubanks, supra,* 14 Cal.4th at p. 591.) This establishes a two-part test: (1) whether there is a conflict of interest; and (2) if so, whether the conflict is so severe as to disqualify the district attorney. (*Id.* at p. 594.) A conflict exists whenever there is a reasonable possibility that the district attorney's office may not exercise its discretionary function in an evenhanded manner. The conflict is disabling only if it is so grave as to render it unlikely the defendant will receive fair treatment. (*Ibid.*)

▮ In addressing the first question, *Eubanks* rejected the contention that a disqualifying interest necessarily must be personal or emotional. (*Eubanks, supra,* 14 Cal.4th at pp. 595-596.) While personal or emotional involvement with a victim will have a particularly strong tendency to imply extraneous motivation, an institutional arrangement that links a prosecutor too closely to a private party who has a personal interest in the prosecution may create a conflict. (*Ibid.*) *Eubanks* also noted that "[a] district attorney is not disqualified simply because, in an effort to overcome budgetary restraints, he or she

has accepted assistance from the public in investigating or prosecuting a crime." (*Id.* at p. 597.) However, in *Eubanks* the matter was different because the district attorney had solicited and accepted, from the victim of a suspected crime, financial assistance to satisfy an already incurred obligation. (*Id.* at p. 598.) The debt was conceded to be substantial, and *Eubanks* concluded that the trial court's finding of a conflict was supported by the record. (*Ibid.*)

With respect to the gravity of the conflict, *Eubanks* noted that the defendants do not have a right to expect crimes to go unpunished for lack of public funds. (*Eubanks, supra,* 14 Cal.4th at p. 599.) Thus, disqualification is not required merely because financial assistance has made prosecution economically feasible. (*Ibid.*) Instead, the inquiry must focus upon whether it appears likely that the prosecutor's discretionary decisionmaking has been placed within the influence or control of an interested party. (*Ibid.*) *Eubanks* distinguished cases in which some forms of victim assistance, such as hiring an attorney to assist the prosecutor, have been found acceptable, because those cases did not involve a victim's payment of an already incurred debt. (*Id.* at p. 600.)

*Eubanks* concluded that, in view of the magnitude of the contribution, the district attorney's budgetary problems, and the factual weakness of the case, the trial court "did not abuse its discretion in finding the victim's financial assistance created a conflict of interest for the prosecutor." (*Eubanks, supra,* 14 Cal.4th at pp. 584, 600-601.) But *Eubanks* determined that the trial court erred "in failing to apply the further test set out in Penal Code section 1424: whether the resulting conflict was so severe as to make fair treatment of the defendants *unlikely*." (*Ibid.*, original italics.) Rather than return the case to the trial court to apply the second prong of the test, the Supreme Court directed the Court of Appeal to vacate its judgment and to dismiss the appeal as moot because the district attorney had abandoned the prosecution after the matter was argued in the Supreme Court. (*Id.* at pp. 584, fn. 2, 601.)

Thus, *Eubanks* and virtually every other disqualification case have been concerned with situations in which the prosecutor has either had a personal interest or been claimed to be under the influence of a private party with a personal interest in the prosecution of the particular defendant, usually by virtue of having been a victim. For example, in *People v. Superior Court (Greer), supra,* 19 Cal.3d at page 259, it was shown that the murder victim's mother was an employee of the district attorney, was assigned to the very office that was prosecuting the case, was a material witness in the prosecution, and stood to gain custody of her granddaughter if one of the codefendants, her former daughter-in-law, was convicted. In *People v. Conner* (1983)

34 Cal.3d 141, 144, 145 [193 Cal.Rptr. 148, 666 P.2d 5], it was shown that a deputy district attorney was a witness, and possibly a victim, of the defendant's offenses. In *People ex rel. Clancy v. Superior Court* (1985) 39 Cal.3d 740, 745 [218 Cal.Rptr. 24, 705 P.2d 347], it was shown that the city hired an attorney to prosecute a nuisance abatement action pursuant to a contingency fee contract that gave him a financial interest in the outcome.

Nevertheless, the decision in *Eubanks* cautions against attempted application of a rigid formula to determine the question of disqualification. *Eubanks* reiterated the two-part test that must be applied on a motion to disqualify, while holding that published authorities are not necessarily authority for a limiting rule. (*Eubanks, supra,* 14 Cal.4th at p. 595.) *Eubanks* added: "In each case, the trial court must consider the entire complex of facts surrounding the conflict to determine whether the conflict makes fair and impartial treatment of the defendant unlikely." (*Id.* at p. 599.)

While rejecting a rigid formula, *Eubanks* provides a framework for consideration of the issue. In this respect, the fact that SHRA is neither a private party nor a specific victim of defendants' alleged offenses is relevant.[1] This is not to suggest that an institutional arrangement between governmental entities never can support a motion to disqualify the prosecutor. *Eubanks* recognized that, in some circumstances, an institutional arrangement may carry the potential to impermissibly skew a prosecutor's exercise of discretion. (*Eubanks, supra,* 14 Cal.4th at p. 596.) However, in this case, there is no showing of the possibility of private-party influence upon the prosecutor, either directly or through institutional arrangements, and that is a factor of obvious significance in considering the necessity of disqualification. We will proceed to consider the factors we find to be relevant in this light.

1. *The interest to be protected*

A motion to disqualify a prosecutor turns on the necessity for independence and impartiality of the district attorney. A district attorney must be independent of private influences because our law does not authorize private prosecutions. (*Eubanks, supra,* 14 Cal.4th at p. 588; see Gov.

---

[1]Nuisance activities may be private when they affect a small number of particular persons. (Civ. Code, §§ 3480-3481.) In that case, the government is not involved. (Code Civ. Proc., § 731; Gov. Code, § 26528.) A nuisance is public when it affects an entire community or neighborhood, or a considerable number of persons, although some may be affected more than others. (Civ. Code, § 3480.) In this sense, SHRA could be considered to be a "victim" of defendants' nuisance activities to the same extent all persons or entities in the community could be considered to be victims. But the possibility that SHRA shares the interests of the People at large is not the type of private interest to which a motion to disqualify is directed. (See *Eubanks, supra,* 14 Cal.4th at p. 590.)

Code, § 100, subd. (b).) "One of the reasons often cited for the institution of public prosecutions is that 'Americans believed that an officer in a position of public trust could make decisions more impartially than could the victims of crimes or other private complainants,' persons who often brought prosecutions under the older English system of criminal justice. [Citations.] This advantage of public prosecution is lost if those exercising the discretionary duties of the district attorney are subject to conflicting personal interests which might tend to compromise their impartiality. In short, the prosecuting attorney ' "is the representative of the public in whom is lodged a discretion which is not to be controlled by the courts, or *by an interested individual. . . ."* ' (Italics added.) [Citation.]" (*People v. Superior Court (Greer)*, *supra*, 19 Cal.3d at p. 267.)

The "disinterest" demanded of a prosecutor is not the type of true disinterest that is the domain of the judge and jury. (*Eubanks, supra*, 14 Cal.4th at p. 590.) A prosecutor has a duty of zealous advocacy and need not be disinterested on the issue of whether the prospective defendant has committed a crime. (*Ibid.*) If convinced of the defendant's guilt, the prosecutor is free, and indeed obligated, to be deeply interested in urging that view by any fair means. (*Ibid.*) In this respect, however, the prosecutor's interest should coincide with the interest of the public in bringing a criminal to justice and should not be under the influence of third parties who have a particular axe to grind against the defendant. (*Ibid.*)

In this light, it can be seen that the interest to be served by a motion to disqualify a prosecutor is the defendant's interest in fair treatment. A defendant has the right to be treated the same as any other person in the same circumstances and thus has the right to expect the prosecutor to be free of the influence of private parties who may have a particular reason for wanting to see the defendant prosecuted and convicted. But a defendant does not have a right or expectation of falling through the cracks for want of resources or lack of prosecutorial zeal. (*Eubanks, supra*, 14 Cal.4th at pp. 590, 599.)

2. *The nature of the district attorney's office*

■ The prosecutorial function is an executive branch function, and the prosecutor's independence is founded in part on the principle of separation of powers. (*People v. Birks, supra*, 19 Cal.4th at p. 134.) A prosecutor is not required to be wholly independent of executive branch influences. (See *Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1132, 1134 [232 Cal.Rptr. 814, 729 P.2d 80].) While the Constitution requires each county to have a district attorney who serves as public prosecutor (Cal. Const., art. XI,

§§ 1, subd. (b), 4, subd. (c); Gov. Code, § 26500), the district attorney is a county officer (Gov. Code, § 24000, subd. (a)) subject to the authority of the county board of supervisors. (Cal. Const., art. XI, §§ 1, subd. (b), 4, subd. (f); Gov. Code, § 25300.) The district attorney's office is funded with county funds pursuant to the county budget established by the board of supervisors and, except as otherwise provided by law, is limited in the making of expenditures or the incurring of liabilities to the amount of appropriations allowed by the budget. (Gov. Code, § 29120.)

A county has the option, in its discretion, to employ a county counsel to perform most of the civil legal duties required by the county. (Gov. Code, §§ 26529, 27642.) In the absence of such an election, the district attorney serves as both public prosecutor and civil attorney for the county. (Gov. Code, § 26500 et seq.) When county counsel is employed, most, but not all, of the district attorney's civil functions are performed by the county counsel. (Gov. Code, §§ 26529, 27642.) However, the district attorney retains some civil law duties, including nuisance abatement. (*Board of Supervisors v. Simpson* (1951) 36 Cal.2d 671, 674 [227 P.2d 14].)

In this respect, Government Code section 26528 provides: "The district attorney may, and when directed by the board of supervisors shall, bring a civil action in the name of the people of the State of California to abate a public nuisance in his county." Likewise, Code of Civil Procedure section 731 provides that the district attorney must bring such an action whenever so directed by the board of supervisors. Accordingly, *Board of Supervisors v. Simpson, supra,* 36 Cal.2d at pages 675 and 676, held that a district attorney could be compelled by writ of mandate to bring a nuisance action when so directed by the board of supervisors.

In addition to usual duties, a district attorney has the authority to participate in noncriminal actions or proceedings that are in aid of or auxiliary to the district attorney's usual duties. (*Rauber v. Herman* (1991) 229 Cal.App.3d 942, 948 [280 Cal.Rptr. 785].) While, as a general rule, district attorneys may not use their funds and powers to intervene in purely private litigation, some functions, though civil in nature, are so closely related and in the furtherance of criminal law enforcement that the district attorney may properly perform them. (*Id.* at pp. 947-948.)

From this it can be seen that the district attorney is not, and is not required to be, wholly independent of the influence of governmental authorities. While the office of district attorney itself is elective, the district attorney is dependent upon county funds budgeted by the county board of supervisors. In some, but not all respects, the district attorney is subject to supervision by

the board of supervisors. (See Gov. Code, § 25303.) In some respects, particularly with regard to nuisance properties, the district attorney is subject to the directions of the board of supervisors.

Therefore, it is evident that, if the board of supervisors budgeted funds to establish a deputy district attorney position to concentrate on nuisance actions, there could be no cause for complaint. If the board of supervisors asked the district attorney to concentrate nuisance abatement activities in certain targeted areas, there could be no cause for complaint. Even if the board of supervisors directed the district attorney to pursue nuisance abatement against a particular nuisance property or nuisance property owner, there could be no cause for complaint. And in pursuing nuisance abatement actions, the district attorney may become involved in any activities that are in aid of or auxiliary to the abatement of the nuisance.

### 3. *The nature of SHRA*

SHRA is a joint powers authority of the city and county. ■ The complexities of public business often necessitate that many of the functions of government be accomplished through administrative agencies. (*California Radioactive Materials Management Forum v. Department of Health Services* (1993) 15 Cal.App.4th 841, 870 [19 Cal.Rptr.2d 357].) Local governments have authority to establish departments, boards, commissions, authorities, and the like to assist in the administration of local affairs. (See *Kugler v. Yocum* (1968) 69 Cal.2d 371, 376-377 [71 Cal.Rptr. 687, 445 P.2d 303]; *Kennedy v. Ross* (1946) 28 Cal.2d 569, 575 [170 P.2d 904].) Such agencies are governmental agencies and not private parties. (*City of Oakland v. Hogan* (1940) 41 Cal.App.2d 333, 342-343 [106 P.2d 987].) Their authority is limited to that delegated to them by law, and they remain subject to the ultimate authority of the local government. (*Kugler v. Yocum, supra,* 69 Cal.2d at pp. 376-377; *Le Strange v. City of Berkeley* (1962) 210 Cal.App.2d 313, 322 [26 Cal.Rptr. 550].) Their actions, within the scope of authority delegated to them, are the actions of the local government and not of a private party. (*City of Oakland v. Hogan, supra,* 41 Cal.App.2d at p. 343.)

■ In equating the interests of SHRA with those of a private party, the trial court found that SHRA had its own interests in the matter which might not include the interests of landowners in using their property as they choose. The court said that SHRA had chosen one party over another with defendants, as owners of the Rolling Green and Ritz motels, already "marked to be losers." As we will explain, these findings do not support the court's disqualification order.

The 1992 report submitted in support of establishing the Auburn Boulevard Redevelopment Project indicates that there were 14 motels located

throughout the project area. Four of those motels, including defendants' motels, were regarded as particularly troublesome in terms of prostitution and other criminal activities. The report proposed a limited plan of public acquisition in order to serve the primary purpose of eliminating the core of prostitution in the area. This was regarded as a last resort, since other means of addressing the problem had not been successful. But, for a variety of reasons, acquisition was not pursued. While SHRA harbored a long-term hope that alternative uses could be developed, it opted to address crime and health and safety issues on an ongoing basis through multi-agency enforcement.

▉ Enforcement of legitimate criminal and civil statutes and health and safety ordinances and regulations is not tantamount to a taking of private property. (*Keystone Bituminous Coal Assn. v. DeBenedictis* (1987) 480 U.S. 470, 491-492 [107 S.Ct. 1232, 1245, 94 L.Ed.2d 472, 492].) ▉ With respect to enforcement actions, the interests of SHRA corresponded with the legitimate interests of the district attorney as public prosecutor. (See *Eubanks, supra,* 14 Cal.4th at p. 590.) Both were concerned with the interests of the people at large (see Health & Saf. Code, §§ 33030, 33037), rather than the private interests of a particular individual (see *Eubanks, supra,* 14 Cal.4th at p. 590). Within the scope of its duties, SHRA acted for the county as an administrative arm of the board of supervisors.

That SHRA's use of the county's CDBG funds to partially fund a prosecutorial position may have enabled the district attorney to proceed further or more quickly against defendants does not in itself constitute unfair treatment. Defendants have no right to expect their alleged violations to go unpunished for lack of public funds. (*Eubanks, supra,* 14 Cal.4th at p. 599.)

The trial court indicated that the Auburn Boulevard Project Area Committee (ABPAC) consisted almost entirely of nonresidential commercial business owners who potentially could have taken advantage of the situation by acquiring the properties at cut-rate bankruptcy prices. But a motion to disqualify a prosecutor must be based upon a likelihood of unfairness and not upon mere speculation. (*Eubanks, supra,* 14 Cal.4th at p. 592.) On this record, the possibility that some private party had an interest in the matter that could have influenced SHRA and, in turn, the prosecutor is wholly speculative. In fact, it appears that, when the bankruptcy trustee elected to abandon the motels, none of the ABPAC members came forward to assert an interest in acquiring the properties.

In sum, SHRA's interest as the county's redevelopment agency is the health, safety, and general welfare of the people of the county and of the

state. (Health & Saf. Code, § 33030.) Its actions with respect to redevelopment areas are those of the city and county. Hence, the alleged influence of SHRA with respect to the district attorney is not of the same nature and quality as that of a private person or entity with a particular axe to grind against the defendant.

### 4. *The source of the funds*

SHRA used a portion of the county's federal entitlement under the CDBG program (42 U.S.C. § 5301 et seq.) to fund its contract with the district attorney. These funds were available to the county through the mechanism of so-called cooperative federalism. Pursuant to that mechanism, the federal government utilizes its taxing and spending powers by returning tax revenues to state and local governments with conditions attached. (See *South Dakota v. Dole* (1987) 483 U.S. 203, 206 [107 S.Ct. 2793, 2795, 97 L.Ed.2d 171, 178].) SHRA's use of CDBG funds to partially fund a district attorney position was consistent with the purposes of the CDBG program. (See 42 U.S.C. § 5301(c)(2).) It was approved by the county board of supervisors, HUD, and the district attorney, who recognized the need for a prosecutor to concentrate on nuisance abatement cases. And the use of CDBG funds was consistent with the state Community Redevelopment Law, which establishes a state policy of utilizing all appropriate means to promote the sound development and redevelopment of targeted areas and which expressly permits a redevelopment agency to accept federal financial assistance and to comply with any conditions of such assistance. (Health & Saf. Code, §§ 33037, 33601.)

### 5. *The manner of payment*

In *Eubanks,* the Supreme Court placed particular emphasis on the fact that the victim of the suspected crime had agreed to satisfy a monetary debt already incurred by the district attorney. (*Eubanks, supra,* 14 Cal.4th at pp. 588, 598, 600.)[2] Here, the trial court considered payments under the SHRA contract to be payment for services rendered, and thus found them akin to the situation in *Eubanks*. We disagree.

The SHRA contract did not call for payment to the district attorney based upon hourly billing or upon a per-case basis. Payment was not based upon

---

[2]The fact that the payment was substantial also was given significant weight. (*Eubanks, supra,* 14 Cal.4th at pp. 594, 600.) In this case, the SHRA contract provided for a maximum annual payment of $70,000. In view of the fact the district attorney's budget exceeds $50 million, the district attorney asserted the payment was insubstantial. The trial court held that the amount of the payment made no difference. However, under *Eubanks,* the amount of the payment is one of the factors that should be considered.

the results achieved, or upon any other form of contingency. Rather, the amount of payment under the contract was simply based upon one-half of the cost of a prosecutorial position. Payment was periodic and came due solely upon the passage of time. Under these circumstances, we conclude the contract payments are more in the nature of a shifting of county entitlement funds to the district attorney's budget than a payment for services rendered to SHRA. The board of supervisors has authority to transfer and revise appropriations within the county budget (Gov. Code, §§ 29120, 29125; *Jarvis v. Bloodgood* (1972) 25 Cal.App.3d 694, 697-698 [102 Cal.Rptr. 212]), and the mechanism of a contract here was necessary to comply with HUD procedures designed to ensure that CDBG funds are used for appropriate purposes.

Considering these factors together, we conclude there is nothing per se contrary to public policy in the use of CDBG funds to partially fund a district attorney position for the purpose of concentrating on nuisance abatement. Such a use of the county's CDBG funds is consistent with the CDBG program. It also is consistent with county policy and with the state redevelopment law. SHRA is not a private party but is an administrative agency of the county exercising authority granted to it by the county board of supervisors. SHRA's actions are those of the county and not of a private party. SHRA's interests are those of the city, the county, the state, and of the people at large, and are not those of a private party with an axe to grind against a particular defendant. Finally, the provision of funding with a general direction that the funds be used for nuisance abatement purposes has less tendency to inhibit the district attorney's exercise of discretion than would a specific direction to pursue nuisance abatement against a particular property, which would be within the prerogative of the board of supervisors.

We next turn to the specific provisions of the SHRA contract. In this respect, we are guided by the established rule that "[a] contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." (Civ. Code, § 1643; see also *id.*, § 3541.) Pursuant to this rule, we will not construe a contract in a manner that will render it unlawful if it reasonably can be construed in a manner which will uphold its validity. (See *Barham v. Barham* (1949) 33 Cal.2d 416, 422 [202 P.2d 289]; *Service Employees Internat. Union, Local 18 v. American Building Maintenance Co.* (1972) 29 Cal.App.3d 356, 359 [105 Cal.Rptr. 564].)

The trial court concluded the contract contained mandatory directives that allowed for no exercise of discretion by the district attorney's

office. Construing the contract as requiring the district attorney to prosecute all nuisance cases arising in target areas, the court stated: "The very terms of the contract removed any discretion from the designated district attorney, Rita Spillane, to determine when and whether to prosecute any specific nuisance case regarding specified property. Instead, the contract required that all such cases be prosecuted, without regard to the conflicting interests that may be at stake and the individual circumstances of each case."

We previously have set forth the terms of the district attorney's agreement. It was agreed that the assigned deputy will focus primarily on nuisance abatement cases in SHRA targeted areas. It was agreed that the deputy "will seek all legal and equitable remedies available to the District Attorney under law on individuals who are found to be in violation of Nuisance statutes." It was agreed that the deputy "will file" drug-house and street-gang abatement cases and "will prosecute such other actions as the District Attorney is empowered to file by law." And it was agreed that the deputy "will target specific properties, accumulate evidence and documentation supporting the alleged nuisance activity, evaluate what remedies are sought, and file suit if response by landowner is inadequate."

These provisions employ similar, although less mandatory, language as that employed in Government Code section 26501, which states: "The district attorney shall institute proceedings before magistrates for the arrest of persons charged with or reasonably suspected of public offenses when he has information that such offenses have been committed." In *Taliaferro v. Locke* (1960) 182 Cal.App.2d 752 [6 Cal.Rptr. 813], 757, the court held: "[A]lthough Government Code section 26501 uses the sometimes mandatory 'shall' in defining the district attorney's duty to institute proceedings, the use is qualified by the ensuing clauses that imply that he, the district attorney, reasonably suspects a person charged with crime and has information to cause him to believe that an offense has been committed." Thus, the qualifying clauses preserve the district attorney's discretion over investigation and prosecution of offenses. (*Taliaferro v. Locke, supra,* at p. 757; see also *People v. Vatelli* (1971) 15 Cal.App.3d 54, 58 [92 Cal.Rptr. 763]; *Ascherman v. Bales* (1969) 273 Cal.App.2d 707, 708 [78 Cal.Rptr. 445].)

In similar fashion here, the contract provisions qualified the statement that the assigned deputy "will" prosecute nuisance abatement actions with provisions reserving to the assigned deputy the discretion over such matters as the investigation and documentation of alleged nuisance activity, the determination whether an individual is in violation of nuisance statutes, the determination and evaluation of available remedies, and the determination of the adequacy of a landowner's response. And the contract left it to

the assigned deputy to formulate and implement procedures, guidelines, and protocols between agencies. Because nothing in the contract expressly required the district attorney to prosecute nuisance actions upon referral by SHRA, or otherwise gave SHRA directional control over the assigned deputy, these qualifying phrases must be construed to preserve the district attorney's prosecutorial discretion.

Moreover, in practice, SHRA did not attempt to control Spillane's discretion. Spillane's primary contact at SHRA was Elizabeth Wolf, who served as liaison between SHRA and the district attorney's office. Wolf testified that she never directed or attempted to influence Spillane with respect to the filing of charges against a particular property. Wolf did not believe that she had any discussion with Spillane about filing charges with respect to the Rolling Green and Ritz motels. And Wolf did not know whether the action that had been filed was criminal or civil in nature. In fact, from her testimony it is apparent that Wolf lacked the training and experience to attempt to direct Spillane in her work.

Spillane demonstrated that, during her tenure as nuisance specialist, she received referrals with respect to 31 properties, including defendants' property. Nine of these properties were not in SHRA targeted areas. Spillane testified that the vast majority of nuisance cases either abate or begin to improve when enforcement authorities become involved. She added: "In my limited experience of 19 months in this position, this case was the only case that, after a multitude of interventions by different county agencies, the property never improved. And with each subsequent inspection, it was at least as bad as, if not worse, with each subsequent inspection." As a result, defendants' case was the only case she had filed during her tenure. This demonstrates that Spillane did not feel obligated to file an action on every property referred to her by SHRA.

The use of CDBG funds to partially fund a deputy position enabled the district attorney to assign a deputy to full-time nuisance abatement activities. But the fact that the arrangement may have enabled the prosecutor to proceed further or more quickly against the defendants is not, in itself, cause for disqualification. (*Eubanks, supra,* 14 Cal.4th at p. 599.) To establish a conflict of interest, it must be shown that the district attorney's discretionary decisionmaking has been placed within the influence and control of a private party with a particular interest in the prosecution of the defendant. (*Ibid.*) That did not occur in this case.

Upon consideration of all the circumstances presented, we find that the use of CDBG funds in general, and the SHRA contract in particular, do not violate public policy.

Our conclusion is consistent with the Massachusetts Supreme Court's decision in *Com. v. Ellis* (1999) 429 Mass. 362 [708 N.E.2d 644] (*Ellis*), which addressed challenges to a statutory scheme in Massachusetts concerning insurance fraud. The insurance fraud bureau (IFB), a statutorily authorized investigatory agency financed by insurers, investigates reports of insurance fraud and, if satisfied that fraud has occurred, refers the matters to the public prosecutor. (*Id.* at pp. 364, 365 [708 N.E.2d at p. 646].) Annual assessments are levied for costs of investigation and prosecution. (*Id.* at p. 366 [708 N.E.2d at p. 647].) At times, the prosecutors attend IFB board meetings to share information and discuss concerns. (*Id.* at p. 376 [708 N.E.2d at p. 653].)

*Ellis* rejected an argument that the statutory scheme operates for the financial benefit of insurance companies, finding instead that the legislation was devised to address the serious public problem of false claims that inflate premiums for insurance buyers. (*Ellis, supra*, 429 Mass. at p. 374 [708 N.E.2d at p. 652].) *Ellis* also rejected the assertion that the structure of the statutory plan gives the IFB control over the prosecutor's decisionmaking function. The court found that the prosecutor's only obligation is to review each IFB investigation report; the statute leaves to the prosecutor the exclusive authority to decide whether to file a criminal action. (*Id.* at pp. 374-375 [708 N.E.2d at p. 652].) In reaching this conclusion, the court observed that "[i]t would not serve the public interest to have a rule that inhibited close cooperation between prosecutors and victims. The important point is that, in the process, the prosecutor must retain total control over the course of the investigation and all discretionary decisions." (*Id.* at p. 373 [708 N.E.2d at p. 651].) IFB assistance in investigations and prosecutions did not translate into control, or even the appearance of control. (*Id.* at p. 377 [708 N.E.2d at p. 653].) "That in the performance of their duties [prosecutors] have zealously pursued the defendants, as is their duty within ethical limits, does not make their involvement improper, in fact or in appearance." (*Id.* at p. 378 [708 N.E.2d at p. 654].)

The contract at issue in this case is similar to the situation in *Ellis*, but is even less supportive of disqualification of the district attorney. The funds in question are not even indirectly obtained from private parties; rather, they are the county's entitlement under a federal block grant program that is administered by the county's housing and redevelopment agency. The funds are used for a public purpose consistent with federal, state, and local laws. And, properly construed, the SHRA contract does not deprive the district attorney of total control over the investigation and prosecution of nuisance cases.

## IV

### *The Conduct of Spillane*

The trial court found it significant that Spillane met with members of various agencies and committees, and maintained frequent contact with SHRA through Wolf, both orally and by means of written memoranda. However, crime and public nuisances are local problems that must be dealt with by both the state and local governments. (Pen. Code, § 13900, subd. (a); Civ. Code, § 3480; Code Civ. Proc., § 731.) And "effective planning and coordination can be accomplished only through the direct, immediate and continuing cooperation of local officials charged with general governmental and criminal justice agency responsibilities." (Pen. Code, § 13900, subd. (c).) Spillane cannot be disqualified by virtue of her efforts to coordinate her prosecutorial responsibilities with the efforts of other local governmental agencies having jurisdiction over some aspects of the overall problem. (See *Ellis, supra*, 429 Mass. at pp. 376-377 [708 N.E.2d at pp. 653-654].)

Nor can Spillane be disqualified for her conduct in July 1997, when before any criminal charges were filed, she scheduled a meeting with the attorney representing defendants in the bankruptcy proceeding. Spillane invited representatives from the sheriff's department, the county's environmental management division, the fire department, the building department, and Wolf from SHRA. The purpose of the meeting was to discuss ongoing code violations and alleged red light and drug problems at the Rolling Green and Ritz motels, and to inform defendants' attorney of the continuing nature of those problems. In her invitation to Wolf, Spillane said: "In my conversation with [defendants' attorney] I told him my theory that the kind of cheap construction used in building these motels has a 'shelf life' and that I believe no amount of money can restore these buildings to safety. They were cheaply constructed and this planned obsolescence has now occurred. A plan for demolition should be put in place. This is just my idea. What do you think of it? I am especially interested in what the Building Department thinks of this."

The trial court found Spillane's formation of a tentative opinion with respect to the "shelf life" of the motels to be improper. It said that a public prosecutor's interest should be to prosecute a case of nuisance only when the case is brought to her attention and the evidence is sufficient to bring the case to trial. The court also saw Spillane's opinion as evidence of her transformation from public prosecutor to civil attorney for the county. We do not agree.

A district attorney's interests are not limited to the prosecution of crime. In fact, a prosecutor's discretion is greatest before charges are filed.

(*People v. Tenorio* (1970) 3 Cal.3d 89, 94 [89 Cal.Rptr. 249, 473 P.2d 993].) Except where a statute makes prosecution mandatory, a district attorney's precharge discretion to investigate and decide whether to file charges is complete and may not be controlled by the courts. (*Ascherman v. Bales, supra,* 273 Cal.App.2d at p. 708.) This discretion necessarily includes the discretion to determine that, despite evidence of a criminal violation, the matter may be sufficiently addressed without prosecution. This is particularly so with respect to nuisance abatement, which involves a balancing of interests. (*People ex rel. Clancy v. Superior Court, supra,* 39 Cal.3d at p. 749.) While Spillane's conclusion regarding the shelf life of the motels could be subject to debate, her efforts to achieve resolution of the alleged problems without criminal or civil litigation is evidence of the exercise rather than abandonment of her prosecutorial discretion.

As we have noted, the trial court found that Spillane went through a transformation from prosecutor to civil attorney. The court said: "When a prosecutor makes decisions and performs functions that go beyond the traditional role of a district attorney, and that prosecutor becomes the civil attorney for a county, a conflict arises."

We reject the view that a conflict of interest arises whenever a district attorney participates in what are normally considered civil matters. First, although counties may, at their option, establish a county counsel to perform most of the civil legal duties required by the county, in the absence of such an election the district attorney is both criminal and civil attorney for the county. (Gov. Code, § 26500 et seq.) Second, when a county counsel has been established, the district attorney still retains some civil duties, most significantly here duties of nuisance abatement. (Gov. Code, § 26528.) Third, a district attorney is permitted to participate in civil matters that are in aid of or auxiliary to the district attorney's usual duties. (*Rauber v. Herman, supra,* 229 Cal.App.3d at p. 948.)

Maintenance of a public nuisance may be prosecuted as a misdemeanor. (Pen. Code, §§ 370-373a.) However, abatement of a nuisance is usually handled as a civil matter, which is nevertheless within the jurisdiction of the district attorney. (Code Civ. Proc., § 731; Gov. Code, § 26528.) Violations of local ordinances may be prosecuted as crimes or may be addressed in civil proceedings. (Gov. Code, §§ 25132, subd. (a), 36900, subd. (a).) Where, as here, alleged violations of local ordinances are inextricably tied to the maintenance of a public nuisance, the district attorney may participate in such civil proceedings as are reasonably in aid of or auxiliary to the district attorney's primary purpose of nuisance abatement. Accordingly, we conclude that Spillane did not create a conflict of interest by participating in actions that may be characterized as civil in nature.

The trial court was particularly concerned over Spillane's conduct with respect to the bankruptcy proceedings. It does not appear that Spillane purported to formally appear in the bankruptcy proceeding; however, she spoke with the bankruptcy trustee and with the examiner appointed to determine whether the matter should be converted from a reorganization to a liquidation proceeding. She attended the hearing at which the matter was converted to a liquidation proceeding. In these contacts, Spillane informed the trustee about the assessments for code violations that had been levied and asked whether they would be dischargeable, informed the trustee and examiner of the condition of the property and the continuing nature of the alleged violations, and unsuccessfully urged the trustee not to abandon the property in the hope that the trustee's involvement could help put an end to the continuing violations.

The trial court found Spillane's conduct with respect to the bankruptcy to be unwarranted. It said that she had lost sight of her role as prosecutor because she had received warnings from nuisance prosecutors in other counties advising that they immediately back away when a bankruptcy is filed, yet she chose not to back away.

To the extent that prosecutors in other counties believe they must accept continuing legal violations when a bankruptcy is filed they are, in a word, wrong. Pursuant to federal bankruptcy law, a trustee, receiver, or manager, including a debtor in possession, is required to manage and operate the property in his possession according to the requirements of the valid laws of the state in which the property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof. (28 U.S.C. § 959(b).) "Implicit in Section 959(b) is the notion that the goals of the federal bankruptcy laws, including rehabilitation of the debtor, do not authorize transgression of state laws setting requirements for the operation of the business even if the continued operation of the business would be thwarted by applying state laws." (*Matter of Quanta Resources Corp.* (3d Cir. 1984) 739 F.2d 912, 919, affd. *sub nom. Midlantic Nat. Bank v. N.J. Dept. of E.P.* (1986) 474 U.S. 494 [106 S.Ct. 755, 88 L.Ed.2d 859].)

In this case, defendants' alleged maintenance of a public nuisance and their alleged health and safety violations were of a continuing nature. When, in the face of enforcement efforts, defendants chose to seek protection of the bankruptcy court, it was proper for Spillane, as nuisance abatement attorney, to participate in the bankruptcy proceedings to the extent necessary to ensure that any action of the bankruptcy court would address the continuing nature of the alleged problem. In short, defendants were not entitled to use the protection of the bankruptcy laws to engage in business as

usual if, in fact, business as usual meant continuing health and safety violations and maintenance of a public nuisance.

■ In general, a prosecutor's conduct in pursuit of her duties, even if erroneous, will not support disqualification. (*People v. Millwee* (1998) 18 Cal.4th 96, 123 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Turner* (1994) 8 Cal.4th 137, 162-163 [32 Cal.Rptr.2d 762, 878 P.2d 521].) ■ In this case, Spillane pursued her duties vigorously; indeed, it appears she was determined to put an end to defendants' alleged continuing legal violations. However, abatement of the nuisance created by defendants' alleged activities would require an end to their continuing legal violations. In this light, Spillane's conduct was reasonable and proper within the scope of her duties as nuisance abatement attorney. That conduct does not establish cause for disqualification.[3]

## V

### *Conclusion*

Upon consideration of the record in light of applicable legal principles, we conclude as follows: SHRA is not a private party but is an administrative agency of the city and the county. SHRA's interests are not private interests but are the public interests reflected in the Community Redevelopment Law and in nuisance abatement statutes. Nuisance abatement may trigger criminal prosecution, but it essentially is a civil matter within the jurisdiction of the district attorney. With respect to nuisance abatement, the district attorney is subject to greater direction from the county than she is in other respects. The use of the county's CDBG funds to partially fund a nuisance abatement specialist in the district attorney's office was consistent with federal, state, and local public policy. In the contract through which the arrangement was consummated, the district attorney did not yield up her usual prosecutorial

---

[3]The trial court seemed impressed by defendants' assertion that Spillane's conduct played a role in sending their bankruptcy case into liquidation and that, by going into liquidation, they ultimately lost their $1.2 million investment. But the record indicates defendants did not have a $1.2 million equity in the property. The property was appraised to have a total value of $1.25 million, less the costs necessary to bring it up to code. Moreover, the record reflects that it would have been extremely costly to attempt to bring the property up to code, and there were hundreds of thousands of dollars of liens against the property. When a trustee in liquidation was appointed, he chose to abandon the property, which he can do only when the property is burdensome to the estate or is of inconsequential value and benefit to the estate. (11 U.S.C. § 554(a).) In view of the condition of the property, the liens against it, and the trustee's decision to abandon the property, there is nothing in the record to support a finding that the property had any actual equity in defendants' hands. In any event, Spillane did not act improperly in seeking to ensure that defendants could not use the bankruptcy proceeding as a means of avoiding their obligation to comply with valid laws.

discretion. Finally, Spillane's actions as nuisance abatement attorney were appropriate to that function.

Accordingly, we reject the trial court's conclusion that the SHRA contract violates public policy, either per se or as written. We further conclude that the record does not support the disqualification of Spillane, her immediate supervisors, and the office unit of which she is a part.

## DISPOSITION

The disqualification order is reversed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 26(a).)

Sims, J., and Morrison, J., concurred.

Respondents' petition for review by the Supreme Court was denied April 11, 2001.