105 Cal.Rptr.2d 566 (2001)
88 Cal.App.4th 163
Jeffrey HAMBARIAN, Petitioner,
v.
The SUPERIOR COURT of Orange County, Respondent;
The People of the State of California, Real Party in Interest.
No. G026447.
Court of Appeal, Fourth District, Division Three.
March 30, 2001.
Review Granted June 13, 2001.
*568 Marshall M. Schulman, Newport Beach, Geragos & Geragos and Mark J. Geragos, Los Angeles, for Petitioner.
No appearance for Respondent.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Carl H. Horst and Douglas P. Danzig, Deputy Attorneys General, Tony Rackauckas, District Attorney, David S. Kirkpatrick, Deputy District Attorney, for Real Party in Interest.

*567 OPINION
O'LEARY, J.
Jeffrey Hambarian petitions for a writ of mandate commanding the superior court to vacate its order denying his motion to recuse the district attorney's office in the prosecution against him for theft- and fraud-related crimes involving his family's waste management businesses. He contends the district attorney had a prejudicial conflict of interest as a matter of law because he allowed one of the victims to pay for an expert investigator in the case. We deny the petition.

* * *
Steven Nakada was the longtime accountant for two Hambarian family companies, Orange Disposal Services (ODS) and Orange Resource Recovery Services (ORRS). In late 1995, he discovered irregularities regarding unpaid shipping invoices and checks that had not been deposited in proper accounts. The companies gave him permission to conduct a fraud audit, but he was unable to complete it due to lack of support from Jeffrey Hambarian and his staff, resistance from the companies' boards of directors, and an unwillingness by the City of Orange (the City) to extend an audit deadline.
Nakada resigned in February 1997 but was soon rehired to assist the companies' new auditing firm, Arthur Andersen, LLP, during the transition period. He performed that work and consulted with Orange Police Department (OPD) and the district attorney's office at times during the course of a year. He billed and was paid about $12,000 by the Hambarian companies for these functions.
The City hired the Andersen firm early in 1997 to audit ODS and ORRS. The audit led to a criminal investigation by the OPD regarding embezzlement of funds. OPD used the Andersen firm to collect and analyze documents and to assist in the preparation and service of search warrants. The Andersen firm provided some assistance to OPD and the district attorney in then[1] initial investigation. It was paid over $18,000 for its services.
The district attorney's office apparently became involved in the OPD investigation in April or May when a search warrant affidavit was drafted. Search warrants issued for ODS, ORRS, Nakada's office, and Curly's Cafe in Signal Hill where several ORRS checks had been cashed. The latter search led to Mark Dix, who admitted he cashed between $400,000 and $800,000 worth of checks for Hambarian at the cafe over an eight-year period.
In July, the City hired Jeff Franzen, a CPA, to "[p]erform accounting services and assist [p]olice [i]nvestigators in the investigation," submit written reports when requested by OPD, and testify in court when required by OPD or the district attorney. Franzen was retained to "protect [the City's] interests" by "identifying *569 and recovering funds that are due the City...."
Franzen performed his work at OPD for about a month. When the district attorney's office assumed full responsibility for the investigation about a month later, Franzen and three members of OPD worked with two district attorney investigators at the district attorney's office.
Since then, Franzen has worked full time as a member of the prosecution team. He has his own office, phone, and supplies. He assists the investigators in questioning witnesses and searching for and analyzing financial data and business records. He is solely responsible for the financial analysis in the case, but he receives instructions from the district attorney's office, as do other case investigators, and not from OPD or the City's other personnel.
Franzen is the only financial expert on the case; no one else on the prosecution team has a comparable job. He receives no direction as to his analyses because he is the only one capable to do it. Franzen briefs the City on his work occasionally. The City has paid him over $314,000 for his services.
In December 1998, Hambarian was charged with 65 counts related to the thefts, including grand theft, presenting false claims, breach of fiduciary duty, filing false tax returns, and money laundering. The total loss allegedly exceeded $2.5 million. Alleged victims included ODS, ORRS, and the City. The City eventually settled its claims against ODS and ORRS. As part of the settlement, the companies assigned to the City their "rights to restitution as a victim of white collar crime by Jeffrey A. Hambarian ... pursuant to Penal Code section 186.11...." The City also instituted a civil suit against Hambarian, his wife and their son.
Hambarian brought a motion to recuse the district attorney's office, arguing essentially that by availing itself of information from the experts the City paid, the district attorney had created an irreparable conflict of interest. After a hearing, the trial court denied the motion, finding: (1) the district attorney did not solicit any payment for the experts' services and incurred no debt; and (2) any conflict was not so grave Hambarian would be likely to receive unfair treatment by the district attorney.
Penal Code section 1424, subdivision (a)(1) provides the standard for prosecutor recusals: "The motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial." The statute was interpreted in People v. Eubanks (1996) 14 Cal.4th 580, 59 Cal.Rptr.2d 200, 927 P.2d 310, which involved facts similar to ours.
In Eubanks, a company that was concerned about trade secret theft by one of its executives and a rival company sought assistance from the police and district attorney. The investigation required computer experts. When the district attorney indicated he did not have the budget to hire an expert, the victim company indicated it would provide funding to do so. The district attorney hired two experts, and the victim paid for them. The defense sought recusal on that ground and the trial court granted it, finding a conflict existed which gave rise to a reasonable possibility the district attorney might not prosecute the case evenhandedly. The Court of Appeal reversed on the ground no conflict existed and even if one did, it was, as a matter of law, not prejudicial. (People v. Eubanks, supra, 14 Cal.4th at pp. 584-588, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
The Supreme Court reversed and remanded. It found a conflict existed, and the trial court could have found prejudice had it used the correct standard of prejudice. The Supreme Court announced the standard of review is whether substantial evidence supports the trial court's findings and whether the trial court abused its discretion in deciding the motion. (People v. Eubanks, supra, 14 Cal.4th at pp. 594-595, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
*570 The court noted Penal Code section 1424 involves a two-prong analysis: (1) whether a "conflict exists," and (2) whether the conflict is prejudicial. As to the first prong, a conflict exists "`whenever the circumstances of a case evidence a reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner. Thus, there is no need to determine whether a conflict is "actual" or only gives an "appearance" of conflict.'" (People v. Enbanks, supra, 14 Cal.4th at p. 592, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
The second prong is more stringent, however. It requires "the potential for prejudice to the defendantthe likelihood that the defendant will not receive a fair trialmust be real, not merely apparent, and must rise to the level of a likelihood of unfairness.... [Disqualification [is not required] merely because the district attorney's further participation in the prosecution would be unseemly, would appear improper, or would tend to reduce public confidence in the impartiality and integrity of the criminal justice system. [Citations.]" (People v. Eubanks, supra, 14 Cal.4th at p. 592, 59 Cal.Rptr.2d 200, 927 P.2d 310, original italics.) When used in this context, a "fair trial" refers to all stages of the prosecution including plea bargaining and sentence recommendations. (Ibid.)
Applying the first prong to the facts, the Eubanks court found nothing in the law restricted district attorney conflicts to personal financial or emotional ties to the case; it also includes institutional interests. (People v. Eubanks, supra, 14 Cal.4th at p. 596, 59 Cal.Rptr.2d 200, 927 P.2d 310.) "[A] prosecutor may have a conflict if institutional arrangements link the prosecutor too closely to a private party, for example a victim, who in turn has a personal interest in the defendant's prosecution and conviction." (Ibid.) Although the prosecutor is not disqualified simply because he or she accepts some help from the public in investigating or prosecuting the crime, the case went beyond the normal cooperation victims give to the prosecution that may impose financial costs. The victim paid about $9,400 for expert services which were the result of a contract between the expert and the district attorney. (People v. Eubanks, supra, 14 Cal.4th at pp. 597-598, 59 Cal. Rptr.2d 200, 927 P.2d 310.)
As to the second prong, the Eubanks court concluded that although the trial court did not use the appropriately rigorous test, it could have found a likelihood of actual unfairness absent recusal. The Supreme Court relied on three factors: (1) the debt was already incurred when the district attorney made a direct request for payment; (2) the size of the fee was substantial enough to take the unusual step of asking the victim to pay it; and (3) the case was weak. (People v. Eubanks, supra, 14 Cal.4th at pp. 599-600, 59 Cal. Rptr.2d 200, 927 P.2d 310.) The matter was remanded for a determination using the proper standard. (Id. at p. 601, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
Under the Eubanks analysis, the trial court in this case found correctly the Andersen firm's and Nakada's participation in the case did not create any conflict. Their services were tangential to the investigation, and they never served directly under the district attorney's supervision. Their relation to the district attorney was not analogous to Eubanks, and any benefit to the district attorney was so minimal it raised no possibility it would affect his handling of the case.
Franzen's involvement is a different matter. Within a month after he was hired, Franzen began to work full time at the district attorney's office. He had virtually no time to develop information for the City's use. His functions were primarily, if not exclusively, prosecution-oriented. His only contact with the City was to provide it with copies of reports. The district attorney gave Franzen an office, a *571 phone, letterhead, and presumably other supplies.
Franzen is effectively working for the district attorney even though the City pays his fee. He has served in that capacity for about three years, earning over $300,000. If Franzen is not serving the district attorney's office essentially as an employee, the district attorney is making an illegal gift of public funds in terms of supplies and facilities. (See Cal. Const., art. XVI, § 6.) These facts give rise to a "`reasonable possibility that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner.'" (People v. Eubanks, supra, 14 Cal.4th at p. 592, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
The district attorney seeks to distinguish Eubanks on the grounds the victim was a governmental entity, the district attorney did not contract directly with Franzen, and the district attorney did not ask the City to pay Franzen. It matters not that the district attorney had no express contract with Franzen nor asked the City to pay him. The district attorney was just as indebted to the City as if it had done so. Franzen is not volunteering his services, and if the City were not paying the tab, the district attorney would be indebted for them.
The City's status as a public entity is not determinative. Although the Eubanks court spoke of a "private" victim, it apparently did so only to distinguish the type of support a public entity might give to the prosecutor in an ordinary prosecution. But this is not a case where a police department loaned an investigator, already on the City's payroll, to the district attorney's office to assist with a big case, nor is it a case where the City's only interest is the general protection of its citizens. And we do not deal with a situation where a victim hired an expert to assist it with civil or internal matters and then shared that information with the prosecution. Franzen performed virtually no services for the City.
The City was a significant victim, and it magnified that role by buying up the corporate victims' causes of action and right to recover possibly millions of dollars. In that capacity, the City hired a third party expressly to handle crucial financial analyses in the case, thus freeing district attorney staff members, assuming there were any who could fill Franzen's role, to pursue other cases and duties.
In essence, the City made a $300,000 contribution to the district attorney's budget. Although the district attorney's office did not request this assistance before the fact, it was nevertheless indebted to the City for its assistance. Although the district attorney's request in Eubanks was a significant factor in finding a conflict existed, nothing in the opinion suggests it was indispensable to the result.
The circumstances were exacerbated by Franzen's incentive to be less than an impartial investigator and expert for the district attorney. He was paid a very sizeable sum by the victim, whose chances for a civil recovery would be greatly enhanced by a conviction. Although Franzen's salary was not contingent upon such a recovery (see People ex rel. Clancy v. Superior Court (1985) 39 Cal.3d 740, 745, 218 Cal. Rptr. 24, 705 P.2d 347), it would be highly difficult for him to perform his role as a member of the prosecution team impartially knowing how his benefactor's financial position depended in a substantial measure on his actions and conclusions. (Id. at p. 746, 218 Cal.Rptr. 24, 705 P.2d 347 [when government attorney has personal interest in the case, essential neutrality is violated].)
Under these circumstances, as a matter of law, "`a reasonable possibility [exists] that the [district attorney's] office may not exercise its discretionary function in an evenhanded manner.'" (People v. Eubanks, supra, 14 Cal.4th at p. 592, 59 Cal.Rptr.2d 200, 927 P.2d 310.) The first prong of the Eubanks test was satisfied.
By making this finding, we do not suggest, however, a conflict arises in every *572 case in which a governmental entity provides personnel to assist the prosecution of a crime, even when that entity is a victim. Such assistance is commonplace, and has been for years. Joint multi-agency, crime-fighting taskforces are becoming evermore prevalent. Such arrangements do not create conflicts for the prosecutor. We caution that conflicts in these situations are very much the exception, not the rule.
Much more was present here, however. Although a governmental entity might be considered loosely a victim of every crime perpetrated in its jurisdiction, the City's status was much stronger. It was not only a direct victim, it acquired the corporate victims' restitution rights, making it effectively the only victim. And, it did not merely loan an investigator who was already on its payroll. After the district attorney's office was deeply involved in the investigation leading to its prosecution, the City hired Franzen, ostensibly to assist it, but as a practical matter he functioned only as a direct agent of the district attorney. Under these circumstances, and given the magnitude of the services donated, a conflict exists.
Due to that conflict, we must analyze Eubanks' second prong. Using the abuse of discretion standard, the question becomes: Could the trial court rationally find there was less than a likelihood the district attorney would be affected by the payment in handling the case? (People v. Breaux (1991) 1 Cal.4th 281, 293-294, 3 Cal.Rptr.2d 81, 821 P.2d 585 [review standard for recusals is abuse of discretion]; People v. Carbajal (1995) 10 Cal.4th 1114, 1122, 43 Cal.Rptr.2d 681, 899 P.2d 67 [court violates abuse of discretion standard when decision is arbitrary, capricious, or exceeds the bounds of reason].)
We start our examination of the trial court's decision using the three factors the Eubanks court applied: (1) whether the debt was already incurred and the district attorney made a direct request for payment; (2) whether the size of the fee was substantial enough to take the unusual step of asking the victim to pay it; and (3) the strength of the prosecution's case. (People v. Eubanks, supra, 14 Cal.4th at pp. 599-600, 59 Cal.Rptr.2d 200, 927 P.2d 310.) Although the Supreme Court did not suggest these factors were a sine qua non to find prejudice or that they are applicable in every case, they provide a basis on which to judge the trial court's exercise of discretion.
As to the first factor, the district attorney, unlike the prosecution in Eubanks, did not engage Franzen's services and ask the City to pay Franzen after the district attorney had become indebted for them. We have noted the hire-first-request-payment-later scenario is not necessary to show a reasonable possibility the prosecutor may not exercise his discretionary function in an evenhanded manner. Nonetheless, where the victim makes the gesture of offering the services of an expert it has already obtained, the likelihood the district attorney will be actually affected is less. Because the prosecuting attorney is not already obligated for payment, it would be less beholden to its benefactor.
Regarding the second Eubanks factor, Franzen's fee is certainly substantial. He has earned more than the district attorney's annual salary. But unlike Eubanks, where the district attorney's resources for this type of investigation were extremely limited (People v. Eubanks, supra, 14 Cal.4th at pp. 598, 600, 59 Cal.Rptr.2d 200, 927 P.2d 310), the record here does not establish the district attorney could not have funded Franzen out of his own budget had the City not paid him.
Moreover, the funds the City expended on Franzen did not inure solely to the district attorney's benefit. Franzen undoubtedly developed information that could be used in the City's civil action, and he submitted regular reports to the City. The City certainly would have paid Franzen a great deal of money in any event.
Concerning the third factor, the district attorney correctly observes that, contrary *573 to Eubanks, the evidence of guilt is apparently strong. Although no preliminary hearing has been held, records involved in the case show, among other things, Hambarian cashed between $400,000 and $800,000 worth of ORRS checks over an eight-year period at Curly's Cafe in Signal Hill.
Our analysis does not end with the three factors, however. Hambarian cites other facts that might arguably show district attorney bias, such as seeking high bail, seeking to freeze Hambarian's funds, resisting discovery, demanding a plea to the entire 65 count information, and making public comments about Hambarian. While these actions may show a zealous prosecution, they do not, as a matter of law, show an overzealous one. We cannot say the trial court abused its discretion by finding they did not add up to the requisite showing.
In sum, the complementary $300,000 investigator/expert arrangement smacks of overreaching by the victim in a way that might cause district attorney bias, but under Eubanks innuendo alone is not enough. "Likelihood" is a high standard and writ relief is not appropriate unless the trial court was irrational when it found that standard had not been met.
In reaching this result, we have carefully reviewed our dissenting colleague's analysis. We share his concern about the problem of victimfinanced prosecutions. Nevertheless, the dissent reinforces our conviction the trial court's ruling should not be overturned. In a nutshell, our colleague's analysis usurps the trial court's factfinding function and exercise of discretion.
We part company with our colleague on three points: (1) the facts and how to interpret them; (2) what the Supreme Court held in Eubanks; and (3) how to apply Eubanks' second prong. First, the facts. Our dissenting colleague asserts his "additional facts complement, and do not contradict, the facts as outlined by the majority." (Dis. opn. at p. 578.) Not so.
For example, the dissent states: (1) the district attorney has an auditor who can handle the accounting issues Franzen was engaged to consider (dis. opn. at p. 579); (2) the City, through Franzen, is actually handling the prosecution on a day-to-day basis (id. at p. 583); (3) Franzen received only loose supervision from the district attorney's office (ibid.); and (4) and the district attorney has no real prosecutorial interest in this case (id. at p. 583). From these facts, our colleague concludes, "The [C]ity is using the district attorney's office ... to obtain a civil advantage against Hambarian." (Ibid.) One might draw that conclusion from the facts as our colleague states them, but they are contrary to our reading of the record, and more importantly, they conflict with the trial court's presumed factual findings.
Moreover, our colleague adds speculation to his recitation of facts. He "suspect[s]" Franzen's billings could exceed $1 million. (Dis. opn. at p. 577.) He surmises the Hambarian companies and their owners, other than Hambarian, were deterred from contesting civil suits and agreed to underwrite Franzen's fee to avoid criminal prosecution. (Id. at pp. 583-584.)
Nothing in the record supports this speculation. For example, nothing shows anyone other than Hambarian was under threat of prosecution. Indeed, the Hambarian companies were alleged victims. Nor does the record show the district attorney was privy at all to the settlement proceedings. Nor does it show Franzen's fee would be considered part of the City's costs of litigation.
Our dissenting colleague's recitation of facts and his speculation ignore our duty as appellate justices: to review the trial court's decision for an abuse of discretion, and not to review the record as if we were trial judges deciding the matter in the first instance. Our task is simply to ask whether substantial evidence supports the implied findings on which the exercise of *574 discretion was based and whether that discretion was abused.
We also apparently disagree with the dissent on what the Supreme Court held in Eubanks. Our colleague contends the court concluded "the conflict was disabling almost as a matter of law. The court would have ordered recusal of the prosecutor except that after oral argument the criminal charges were dismissed, technically making the case moot." (Dis. opn. at p. 581, italics added.) Our colleague provides no citation to Eubanks majority opinion for that proposition, and we find nothing in the court's opinion that supports it. The Supreme Court merely concluded the trial court in that case might have found a likelihood of actual prosecutorial bias. (People v. Eubanks, supra, 14 Cal.4th at pp. 584, 601-602, 59 Cal.Rptr.2d 200, 927 P.2d 310; compare id. at p. 604, 59 Cal. Rptr.2d 200, 927 P.2d 310, cone. opn. of George, C.J.) The Supreme Court found nothing as a matter of law, not even "almost."
We are also at odds with our colleague on how to apply Eubanks' second prong. The dissent suggests we and the trial court improperly limited our analysis of the likelihood of bias to the three factors discussed in Eubanks. To the contrary, we expressly considered five additional factors (ante at p. 581), on which Hambarian relied exclusively to assert a likelihood of district attorney bias. The trial court recognized and discussed the same factors in detail when it ruled. Our dissenting colleague ignores these factors, choosing instead to consider two others: (1) whether this was essentially a civil matter prosecuted solely to gain an advantage in a civil action; and (2) whether the district attorney has a "prosecutorial interest" in the case. (Dis. opn. at pp. 582-584.)
Assuming, without deciding, the dissent's additional factors are valid, the result does not change. As to the first factor, it is quite a stretch to suggest this was merely a civil action in the guise of a criminal prosecution. After all, it involves an alleged $2.5 million theft from two businesses and, effectively, every citizen in the City. It would have been prosecuted in any event. Although the City's arrangement with the corporate victims and its provision of Franzen to the district attorney raised questions about the City's motives and created the appearance of a conflict, it says nothing about the district attorney's motives.
The second factor, alleged district attorney disinterest in prosecuting the case, is also unavailing. As we have noted, the trial court implicitly found the contrary was true. Indeed, if the district attorney were truly uninterested in prosecuting this case, we would not likely have seen him fighting recusal as he has. Our dissenting colleague might say the district attorney is only doing what any paid shill would do, but we are not that cynical. More importantly, neither was the trial court.
We must also comment on our dissenting colleague's statement that begins, "If prosecutors are entitled, as my colleagues suggest, to compel a wealthy public entity to provide and pay for the use of an additional in-house investigator...." (Dis. opn. at p. 585.) We suggested nothing of the sort. We took great pains to distinguish Eubanks, where the payment was arguably coerced, from our case, where it was not. Indeed, we considered the absence of that factor in evaluating whether the facts showed a likelihood of a biased prosecution.
The dissent may be summed up as this: If a victim pays a great deal of money albeit a fraction of the district attorney's budgetto provide a full-time expert witness or investigator to the prosecution, and the victim has a civil suit pending that is somewhat dependent on the outcome of the criminal prosecution, there is, as a matter of law, a likelihood the district attorney will be biased in its prosecution. In essence, our dissenting colleague asserts *575 prong one of the Eubanks analysis establishes prong two. (See dis. opn. at p. 583.)
We do not believe the Supreme Court intended such a rule. None of the cases our colleague cites or any others we have considered compel that conclusion. And, any such rule would offend the traditional deference to trial court rulings which the abuse of discretion standard provides when considering whether a likelihood of prejudice exists in a given case. The Supreme Court plainly adhered to that concept in Eubanks, as we have here.
Our dissenting colleague bemoans a criminal justice system in which victims with money may get better justice than those without it. (Dis. opn. at pp. 584-585.) That is, of course, not a desirable or permissible goal of the system. But it is not a perfect world. Resources are finite. And, as a practical matter, if the prosecution does not have some outside assistance in certain complex cases, the victims, rich or poor, will receive no justice.
As Presiding Justice Scotland cogently observed in People v. Parmar (2001) 86 Cal.App.4th 781, 795, 797, 104 Cal.Rptr.2d 31, "[Defendants do not have a right to expect crimes to go unpunished for lack of public funds. [Citation.] Thus, disqualification is not required merely because financial assistance has made prosecution economically feasible. [Citation.] [¶] ... [¶][T]he interest to be served by a motion to disqualify a prosecutor is the defendant's interest in fair treatment. A defendant has the right to be treated the same as any other person in the same circumstances and thus has the right to expect the prosecutor to be free of the influence of private parties who may have a particular reason for wanting to see the defendant prosecuted and convicted. But a defendant does not have a right or expectation of falling through the cracks for want of resources or lack of prosecutorial zeal. [Citation.]"
The authority on which our Third District colleagues relied to make these comments? Eubanks. Our Supreme Court's focus in Eubanks was district attorney bias, not equal protection for victims. Although equitable prosecution services for victims is a laudable goal, it must be achieved by adequate funding of prosecutors' offices, a legislative function. It should not be accomplished by allowing the guilty to go free simply because victims having the wherewithal are flatly prohibited from contributing resources to attain justice.
The high court obviously realized this concept, as we do. The only limitation is that victim assistance must not create an actual likelihood of unfair treatment in the prosecution of the defendant. Nothing in our colleague's facts or analysis showsas a matter of lawsuch a likelihood exists in Hambarian's case.
The district attorney should not take great solace in our result, however. As we noted, the trial court incorrectly found the district attorney had no conflict of interest. A conflict existed and it continues to exist. Moreover, we applied the abuse of discretion standard with due deference, but we might not have reached the same result had we been sitting as trial judges.
The only thing that keeps the district attorney on the case is the trial court's finding that prejudice has not been established. The court could properly make that finding when it heard the motion, but that does not mean it will always be so.
The case is at an extremely early stage of the proceedings; the preliminary hearing has not been held. The apparent strength of the case may wane on further scrutiny. And, as the case ages, Franzen's bill will undoubtedly grow larger. At some point the amount the City has underwritten might become so large no rational jurist could say the prosecutor would not be unduly influenced.
Although there are limits on revisiting issues during litigation, and we urge the *576 defense not to be unduly repetitious, changed circumstances may merit further consideration by the trial court. That uncertainty is only one of the vices inherent in allowing victims to help underwrite the cost of prosecuting a case. It is not a practice we favor, and we do not relish the possibility of seeing this case again. The district attorney can avoid that potential problem by reimbursing the City for Franzen's expenses, purging the conflict.
The petition is denied.
BEDSWORTH, J., concurs.
SILLS, P.J., Dissenting.
I respectfully dissent. If this method of financing criminal prosecutions is blessed with appellate holy water, then county boards of supervisors and finance directors throughout the state will begin demanding that prosecutors fund a large portion of their criminal prosecutions from municipal coffers, corporate treasuries, and private party checkbooks. While imposition of "user fees" may be an acceptable local financing tool for parks, playgrounds, and community centers, it is antithetical to this state's basic belief that criminal prosecutions are brought in the name of the people, rather than just those who can afford to pay the freight. I conclude the superior court should have granted the motion to recuse.

I

THE MAJORITY OPINION
My colleagues and I agree that the Orange County District Attorney's Office has a conflict of interest in this case as a matter of law. Jeff Franzen, the certified public accountant hired by the City of Orange to work on this case, is housed in the district attorney's office and brings the power, prestige, and badge of that office to bear when he conducts investigations and interviews witnesses. While his paycheck is cut by the city and his salary may not be dependent upon any particular recovery,1 common sense tells us "it would be highly difficult for him to perform his role as a member of the prosecution team impartially knowing how his benefactor's financial position depended in a substantial measure on his actions and conclusions." (Maj. opn. ante, at p. 571.)
We disagree, however, as to whether the conflict is so grave that recusal of the district attorney's office is required. My colleagues say no, but then caution the district attorney's office that it "should not take great solace in the result" because had they been the trial judge they "might not have reached the same result." (Maj. opn. ante, at p. 575.) They also state that, "At some point the amount the City has underwritten might become so large no rational jurist could say the prosecutor would not be unduly influenced." (Ibid., ante.) Granted, these admonitions are dictum. But they put the district attorney's office on notice that as time goes by, and Franzen's bills mount, its legal position weakens. I also think it a reasonable inference that my colleagues recognize the trial court got it wrong, but not so wrong that they are willing to say the trial court abused its discretion.
But any thought that these admonitions will discourage the district attorney's office from continuing to accept the assistance of the city's accountant is, in my view, unrealistic. Advising the district attorney's office that it has not yet crossed the financial Rubicon signifies nothing; it only serves to *577 give it the green light to pursue the present course. Moreover, the suggestion a renewed motion might be more successful is illusory when the motion to recuse was brought prior to the preliminary hearing and the right to renew it on the same ground is quite limited. (See Pen.Code, § 1424, subd. (a)(1) ["If the motion is brought at or before the preliminary hearing, it may not be renewed in the trial court on the basis of facts that were raised or could have been raised at the time of the original motion"].) If we want to save everyone from having to revisit this issue later, we should offer concrete guidance, such as how much the city may underwrite the investigation before the conflict actually becomes disabling.
And any belief my colleagues may entertain that these admonitions will nudge the district attorney's office into voluntarily purging the conflict is, if anything, wishful thinking. They assert that "The district attorney can avoid that potential problem by reimbursing the City for Franzen's expenses, purging the conflict." (Maj. opn. ante, at p. 575.) Reimbursing the city its costs might (and I emphasize, might) solve the problem. But that issue is not before us, and we should not be tipping our hand as to how we might resolve it before it is before us, fully fleshed out. In any event, at the time of the hearing Franzen had billed the city $314,155.20; he has likely billed the city nearly $500,000 by now; and, I suspect, based on the record, that his billings could exceed $1 million by the time the criminal proceeding concludes. It is doubtful the district attorney's office has sufficient unbudgeted funds to reimburse the city this amount, and unlikely the County of Orange, still trying to resolve the financial problems resulting from its recent bankruptcy, would advance general fund moneys to cover it.
Even if the district attorney's office were willing to follow my colleagues' suggestions, I feel compelled to state my disagreement with my colleagues' analysis of the legal issue.
The majority bottom their analysis on People v. Eubanks (1996) 14 Cal.4th 580, 59 Cal.Rptr.2d 200, 927 P.2d 310, which holds a prosecutor cannot require a victim to pay for the prosecution of a specific criminal matter.[2] In Eubanks, our high court explained that recusal was warranted there because the conflict placed the discretionary decisionmaking power of the prosecutor within the victim's influence and control. (People v. Eubanks, supra, 14 Cal.4th at p. 599, 59 Cal.Rptr.2d 200, 927 P.2d 310.) The peculiar factual factors which supported recusal were findings the prosecutor solicited the victim to satisfy a debt already incurred, the victim's contribution was fairly large in comparison to the prosecutor's budget, and the case was perceived by the trial court as factually weak. (Id. at p. 600, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
In the case before us, my colleagues take the factors peculiar to Eubanks and look to see if they are present in the case *578 at hand. Not finding them, they conclude the conflict is not sufficiently grave to require recusal. It should be readily apparent that while such reasoning could be used to prove the conflict was grave enough to require recusal, it cannot be used to prove the reverse. (Cf., e.g., Feynman, The Meaning of It All (1998) pp. 80-81.) Even if such reasoning could be used that way, it ignores the question Eubanks said the courts are to ask, i.e., whether the conflict makes it likely the accused will not receive a fair trial because the prosecutor's discretionary decisionmaking power has been placed within the victim's influence or control. (People v. Eubanks, supra, 14 Cal.4th at p. 599, 59 Cal.Rptr.2d 200, 927 P.2d 310; see also Pen.Code, § 1424.)
It seems clear to me, based upon my reading of the record, that the district attorney's office has ceded its discretionary decisionmaking power to the City of Orange. Accordingly, as Penal Code section 1424, Eubanks, and the other cases which have interpreted this section instruct, the conflict here is disabling as a matter of law.

II

SUPPLEMENTAL FACTS
Since the majority's opinion compares the actions of the district attorney's office with the three factual factors in Eubanks, its recitation of the facts of the case before us is limited to those that frame the question as posed. But given that the question Eubanks says courts should ask is of a broader scope, it is necessary to include additional facts from the record in this proceeding. These additional facts complement, and do not contradict, the facts as outlined by the majority.[3]
Questions about the efficiency of Hambarian's trash hauling business, its costs, and whether the city was getting its fair share of the revenue generated by the recycling part of the business began circulating through the halls of city government in October 1995. Much of the information fueling the discussion came from Steven Nakada, Hambarian's accountant. He had been advising city officials for some time that there were problems with Hambarian's books, and that an audit would be necessary to determine if any money had been embezzled. These ongoing discussions eventually stirred up enough concern so that in early 1996 city staff began hiring "consultants to conduct a professional review of the service levels and operating costs that it was felt needed analysis."
In early 1997, the city hired Arthur Andersen, the accounting firm, "to conduct a fraud audit of the operations." Within a few weeks, Arthur Andersen had "uncovered activity which included possible theft of recycling revenues," and in April of that year its findings were turned over to the city police department and the district attorney's office. The police department soon began a criminal investigation. In June 1997, the city issued a news release announcing that its police department and the district attorney's office "have *579 launched a criminal investigation" into Hambarian's trash hauling businesses. The press release indicated it was not yet known whether the city had suffered any financial loss.
In July 1997, the city approached Franzen to determine if he was interested in helping the police department conduct its investigation. He had worked for the city once before, and was immediately available because he was at the time working out of his home. He had, however, never qualified as an expert witness. A deal was quickly struck, and Franzen entered into a "consultant agreement" with the city. Although he was to work with the police department, the contract was with the city because, according to the city attorney, the police department has limited contract authority. Compensation was set at $75 per hour. Most of the agreement is boilerplate, but there are three provisions which bear scrutiny.
The first one is paragraph 3, which is entitled "Independent Contractor." It provides that: "At all times during the term of this Agreement, Consultant shall be an independent contractor and shall not be an employee of the City. City shall have the right to control Consultant only insofar as the result of the Consultant's services rendered pursuant to this Agreement. City shall not have the right to control the means by which Consultant accomplishes services rendered pursuant to this Agreement. Consultant shall, at it[s] sole cost and expense, furnish all facilities, materials and equipment which may be required for furnishing services pursuant to this Agreement."
The second one is paragraph 10, which is entitled "Products of Consultant." It provides that: "The documents, study materials and other products produced by Consultant for this Agreement shall become the property of the City and upon payment by the City for the work involved in their production, Consultant shall deliver all such products to the City prior to payment for same. The City may use, reuse or otherwise utilize such products without restriction."
The final one is exhibit A to the agreement, which is entitled "Scope of Work." It indicates that Franzen is to:
"1. Perform accounting services and assist Police Investigators in the investigation of possible thefts or other fraud in association with the City's contracts with Orange Disposal Services (ODS) and Orange Resource Recovery Services (ORRS).
"2. Submit written reports detailing the work performed when required by the Police Department.
"3. Testify in Court regarding the work performed when required by the Police Department or the Orange County District Attorney's Office."
The initial consultant agreement capped Franzen's compensation at approximately $30,000. The compensation cap was amended upwards three times over the years, and the last amendment to the agreement removed any cap on his compensation. These amendments also made it clear that as a part of his duties Franzen was to coordinate his investigation with representatives of the Internal Revenue Service and the Franchise Tax Board who were also apparently investigating other aspects of Hambarian's businesses.
Whether Franzen was really hired to work with the city police department or the district attorney's office is unclear. In statements to the city council, staff indicated that Franzen had been hired to "assist" the district attorney's office, and that the city would seek reimbursement for Franzen's costs from Orange Resource Recovery Services, one of the businesses that had been run by the Hambarian family. The city manager further explained that the city would "seek reimbursement of costs through the conviction process undertaken by the District Attorney's office." These statements were consistent with the city's June 1997 press release, which had *580 indicated that its police department and the district attorney's office "have launched a criminal investigation."
The district attorney's office, on the other hand, told the superior court it only became involved in the investigation on August 7, 1997. In a meeting that day between members of the city police department, the district attorney's office, and Franzen, it stated the chief of police said he "did not have enough manpower to complete what was becoming a complex and potentially long term investigation." He asked the district attorney's office to take "responsibility for the investigation [and] agreed to continue supporting the investigation by assigning full-time to the District Attorney's office the two investigators who had initiated the investigation ... as well as the contracted CPA, Jeff Franzen." The district attorney's office agreed, and "[s]hortly thereafter, all documents and evidence that had been obtained to that date, as well as [the two investigators] and Franzen, were physically transferred to the Major Fraud Unit of the District Attorney's office." Franzen was moved into the district attorney's office even though it has an investigative auditor within the office who was capable of handling the accounting issues raised by the investigation.
Since entering into the consultant agreement, Franzen has interviewed more than 55 witnesses, and has accompanied the police on the execution of various search warrants. Summaries of these interviews and other reports are prepared by Franzen and given to his supervisors within the district attorney's office. Many of these summaries and reports are passed along to the city. The district attorney's in-house auditor has not participated in the investigation, but Franzen was instructed to spend several hours observing him testify in an unrelated case.
Franzen submits invoices for his work to the police department for approval. The invoices are simply for services rendered, and are routinely paid by the city without review of the backup documentation. Among other things, Franzen admitted his invoices included billing the city several hundred dollars for attending the current district attorney's swearing-in ceremony. That bill was paid without comment. The district attorney's office has not entered into any contract with Franzen, nor has it paid him any fees for his services.
On December 15, 1998, a 65 count felony complaint[4] was filed against Hambarian. At prosecutor's urging, the trial court froze his assets and set an extremely high bail, which this court later reduced.
Meanwhile, the city filed a civil action for money against Hambarian, his wife, and their 15-year-old son. That action is still pending. The city also filed a civil action against Orange Disposal Services, Orange Resource Recovery Systems, Recycle Orange, Hambarian Properties, SAH Transportation, Sam A. Hambarian, Alyce A. Hambarian, Michael L. Hambarian, and Donald Hambarian (the Hambarian parties), alleging they had breached their agreement to construct and operate a material recovery facility. In settling that action, the Hambarian parties paid the city several million dollars and assigned any rights they might have against Hambarian to the city. In consideration, the city agreed to pursue all claims against Hambarian and share any "net litigation proceeds" it might receive with the Hambarian parties. Under the settlement agreement, net litigation proceeds are calculated by subtracting the city's costs from any moneys recovered by the city, up to $2.1 million.

*581 III

THE APPLICABLE STANDARD
A defendant's motion to recuse the prosecutor must show two things. It must prove the prosecutor has a conflict of interest, and the conflict is so grave it "would render it unlikely that the defendant would receive a fair trial." (Pen. Code, § 1424, subd. (a)(1).) Given the district attorney's office has a clear conflict of interest here, it is the second prong of the test which drives this case.
In determining whether a prosecutor's conflict is sufficiently grave to warrant recusal, "the trial court must consider the entire complex of facts surrounding the conflict to determine whether the conflict makes fair and impartial treatment of the defendant unlikely." (People v. Eubanks, supra, 14 Cal.4th at p. 599, 59 Cal.Rptr.2d 200, 927 P.2d 310.) The court does not focus on whether the conflict makes prosecution of the case easier. (Ibid.) Rather, its focus is on whether the conflict makes it likely the prosecutor "may not exercise its discretionary function in an evenhanded manner." (People v. Conner (1983) 34 Cal.3d 141, 148, 193 Cal.Rptr. 148, 666 P.2d 5; see also People v. Parmar, supra, 86 Cal.App.4th at pp. 795-796, 104 Cal. Rptr.2d 31; People v. Choi (2000) 80 Cal. App.4th 476, 480, 94 Cal.Rptr.2d 922; People v. Neely (1999) 70 Cal.App.4th 767, 776, 82 Cal.Rptr.2d 886; Millsap v. Superior Court (1999) 70 Cal.App.4th 196, 200, 82 Cal.Rptr.2d 733.)
The scope of the prosecutor's discretionary function is broad. It extends "from the investigation and gathering of evidence relating to criminal offenses [citation], through the crucial decisions of whom to charge and what charges to bring, to the numerous choices the prosecutor makes at trial.... [Citations.]" (People v. Eubanks, supra, 14 Cal.4th at p. 589, 59 Cal.Rptr.2d 200, 927 P.2d 310.) More importantly, though, it "necessarily includes the discretion to determine that, despite evidence of a criminal violation, the matter may be sufficiently addressed without prosecution." (People v. Parmar, supra, 86 Cal. App.4th at p. 807, 104 Cal.Rptr.2d 31.)
While cases addressing the gravity of a prosecutor's conflict generally involve the prosecutor's personal interest in a matter (see, e.g., People v. Superior Court (Greer) (1977) 19 Cal.3d 255, 270, 137 Cal.Rptr. 476, 561 P.2d 1164 [mother of victim was clerical employee of district attorney's office]), a prosecutor's impartiality may be impaired just as easily "by institutional interests." (People v. Eubanks, supra, 14 Cal.4th at p. 595, 59 Cal.Rptr.2d 200, 927 P.2d 310.) Institutional interests are not limited to the receipt of monetary benefits. (Id. at pp. 595-596, 59 Cal.Rptr.2d 200, 927 P.2d 310.) "More to the present point, a prosecutor may have a conflict if institutional arrangements link the prosecutor too closely to a private party, for example a victim, who in turn has a personal interest in the defendant's prosecution and conviction. As Judge Friendly put it in Wright v. United States [2d. Cir.1984] 732 F.2d [1048] at page 1056, a prosecutor `is not disinterested if he has, or is under the influence of others who have, an axe to grind against the defendant.' (Italics added.)" (Id. at p. 596, 59 Cal.Rptr.2d 200, 927 P.2d 310; see also Lewis v. Superior Court (1997) 53 Cal.App.4th 1277, 1286, 62 Cal.Rptr.2d 331 [Orange County District Attorney's Office was recused from prosecution of county auditor for misfeasance because, among other things, there was personal animosity between departments concerning the district attorney's budget].)
The above principles were applied in Eubanks, the only reported case in the country to date that has considered whether a prosecutor may compel a private crime victim to pay for the prosecution. In that case, the prosecutor solicited and accepted financial assistance of around $13,000 from the corporate victim in order to satisfy a debt the prosecutor had already incurred hiring an expert to investigate the high-tech aspects of the alleged crime. After considering the factual context *582 of the case, the high court concluded the prosecutor had a conflict of interest, and the conflict was disabling almost as a matter of law. (See People v. Eubanks, supra, 14 Cal.4th at p. 604, 59 Cal.Rptr.2d 200, 927 P.2d 310, cone. opn. of George, C.J.) The court would have ordered recusal of the prosecutor except that after oral argument the criminal charges were dismissed, making the case moot.
Eubanks teaches that a prosecutor may not compel a private victim to fund any part of a criminal prosecution.[5] Whether the prohibition is grounded in the well-established California rule that private citizens may not independently institute criminal proceedings, or rests on the more idealistic notion that justice simply should not be for sale, is unimportant. What is clear is that Eubanks spares the victim the Hobson's choice of having to decide whether or not to provide financial assistance to the prosecutor's office. And while the prosecutor in that case solicited the payment, nothing in Eubanks suggests the rule would be any different if rather than being asked, as so often happens, the victim volunteers to make the payment. (See Cozying Up to the Cops (Jan.2000) Cal. Lawyer 19.) In either case, the victim pays a debt incurred by the prosecutor as part of a routine criminal investigation.
The Eubanks court was careful, however, not to put a monkey wrench into normal police and prosecution work. It recognized recusal is not required when the amount involved is de minimis, the victim collects and organizes necessary information from internal sources, or the information was obtained by a private investigator as part of an external investigation. (People v. Eubanks, supra, 14 Cal.4th at p. 598, 59 Cal.Rptr.2d 200, 927 P.2d 310; see also International Business Machines Corp. v. Brown (C.D.Cal.1994) 857 F.Supp. 1384, 1389.) Stated another way, a victim may give the prosecutor copies of documents it has privately obtained; it cannot, however, buy the prosecutor's office a copying machine to make the copies without impairing the prosecutor's impartiality.[6]

*583 IV

THE GRAVITY OF THE CONFLICT
The superior court found the conflict was not disabling because the city had paid Franzen's fees, the district attorney's office had neither solicited nor incurred the debt, and the case was portrayed by the prosecutors as strong. While these findings carry some weight and cannot be ignored, they do not answer the fundamental question as to whether the district attorney's office has ceded its discretionary decisionmaking function to the city. For that, the Eubanks standard must be applied. A fair reading of the record under the appropriate standard discloses numerous factors that not only support recusal but virtually require it. And, while abuse of discretion is generally the proper standard of review from an order denying a motion to recuse, it is also clear under Eubanks that reviewing courts may direct the trial court to recuse the prosecutor in situations where, as here, the trial court did not apply the correct standard.[7]
Whether a criminal complaint should be filed in a particular case rests within the discretion of the prosecutor. The California District Attorneys Association, the National District Attorneys Association, and the American Bar Association have created a list of factors the prosecutor should weigh in exercising that discretion. (James, The Prosecutor's Discretionary Screening and Charging Authority (Mar./ Apr. 1995) vol. 29, Prosecutor 22, 25.) One factor is whether the matter is essentially civil in nature and is being filed solely to gain an advantage in a civil action. More specifically, the prosecutor should consider whether adequate civil remedies are available, and "Non-criminal disposition should be favored where an alternative to prosecution is the soundest approach to redressing the harm done, to rehabilitating the offender, and to conserving resources." (Id. at p. 29.)
The existence of, and preference for, a civil remedy was one of the factors the Eubanks court recognized should be given great weight in deciding whether the prosecutor's conflict was sufficiently grave to require recusal. In his concurring opinion, Chief Justice George pointed out "the district attorney would have appreciated that Borland stood to benefit from the criminal prosecution of defendants. Not only would such a prosecution assist Borland's parallel civil action, help protect any asserted trade secrets, and serve to deter others from committing similar acts in the future, but prosecution also would constitute a major disruption and distraction for Symantec Corporation, one of Borland's primary competitors." (People v. Eubanks, supra, 14 Cal.4th at p. 602, 59 Cal.Rptr.2d 200, 927 P.2d 310.) Similarly, it would be rather naive to believe that the district attorney's office here did not appreciate that the city stood to benefit greatly from the criminal prosecution. *584 Such a prosecution would assist the city in its parallel civil action against Hambarian, deter the Hambarian parties from contesting parallel civil suits against them for fear of criminal prosecution, assist the city in enforcing its monetary settlement with the Hambarian parties which depends in large part on Hambarian's conviction in the criminal proceeding, and ensure that Hambarian would be forced to sell his trash-hauling business. Such a prosecution would also compromise Hambarian's ability to simultaneously defend both the criminal and civil actions because he would be subject to significant bail, his assets would be frozen, and relevant evidence could be gathered within the standards of criminal proceedings, an advantage over procedures applicable in civil proceedings.
The district attorney's office has also shown little interest in taking personal responsibility for prosecution of the case. Although it told the superior court it had "assumed responsibility" for the matter, the city, through Franzen, is actually handling it on a day-to-day basis. While several deputies in the office had participated on occasion in particular aspects of the case, it is unclear from the record whether anyone other than Franzen was making the basic prosecutorial decisions as to what to investigate and who to interview. Franzen confirmed there was loose supervision, testifying that he did not receive much supervision or direction from the district attorney's office; he simply knew what had to be done and did it. What he had done, by the time of the hearing, was conduct 55 interviews of witnesses, made numerous reports to members of the district attorney's office, and turned over many of those reports to the city for its use in the civil action against Hambarian. Moreover, it is apparent from partial transcripts of those interviews that their scope often exceeded his expertise, going into matters that do not have a direct bearing on accounting issues.
The hiring of an outside expert further shows that the district attorney's office has no real prosecutorial interest in this case. The district attorney's office has on staff an accountant who has the expertise to conduct the necessary forensic accounting here. Moreover, nothing in the record suggests this is a particularly difficult investigation that requires a highly-skilled expert. Both Nakada and the Arthur Andersen firm, for example, found the alleged fraud quickly, and they were always available to assist the prosecutor in conducting any further investigations which became necessary. In addition, Franzen has never qualified as an expert witness, and nothing in the record suggests he has any particular expertise beyond that of the district attorney's investigator and accountant.
The victim's paying and placing of an expert witness or investigator inside the bowels of the district attorney's office could only be justified, if ever, in a truly exceptional case. I am not prepared to say what those exceptional circumstances would be since I cannot presently conceive of any. But this is clearly not that case. The city is using the district attorney's office, and the power that the prosecutor's office brings to an investigation, to obtain an advantage in its civil action against Hambarian. Indeed, if Franzen can get the charges against Hambarian to stick, his efforts will not cost the city a penny because the other family members, in order to avoid criminal prosecution, have already indirectly agreed to finance the prosecution.
In an effort to put a friendlier spin on the facts, the district attorney asserts that a prosecutor should not be recused merely because the victim turned over information relevant to the prosecution. True, but that is not what happened here. The information was not gathered from the city's own files or as part of an external investigation and then turned over to the prosecutor. It was gathered by the victim's investigator operating out of and under the badge of the district attorney's office.
The district attorney also asserts that whatever the gravity of the conflict, the *585 evidence is so strong that recusal would be inappropriate. Without a preliminary hearing record, it is all but impossible to judge the strength of the underlying criminal case. Furthermore, relying on statements by counsel about the strengths and weaknesses of their respective cases is a suspect method at best for an appellate panel to judge any matter. I have, for the purpose of reviewing the denial of the motion to recuse only, assumed some evidence supports the pending criminal charges. (Cf. People v. Eubanks, supra, 14 Cal.4th at p. 600, fn. 9, 59 Cal.Rptr.2d 200, 927 P.2d 310.) But I am unwilling to accept the idea that a prosecutor is immune from recusal solely if it can spin a tale of great wrongdoing.

V

POLICY CONSIDERATIONS
One final point should be made. This case raises several troubling aspects involving what appears to be a growing trendthe innovative financing of criminal prosecutions by victims.[8] Our case is but one example of how prosecutors have, through indirect means, tried to evade the prohibition against the private financing of specific criminal prosecutions. (See People v. Eubanks, supra, 14 Cal.4th at p. 588, 59 Cal.Rptr.2d 200, 927 P.2d 310 ["California law does not authorize private prosecutions"].) Given the financial constraints which have beset governmental agencies during the past decade, this is not a surprising development. Nevertheless, such financial arrangements, in whatever guise, raise important questions about the ability of all victims, regardless of personal wealth, to expect the reasoned exercise of prosecutorial discretion.
The City of Orange is apparently financially sound. But other public entities, such as our school districts and many of our small municipal corporations, are not. Those entities are financially strapped and have limited resources. Will they receive the same treatment this city has if they suspect they are being victimized by computer fraud or some embezzlement scheme? Or does the red carpet treatment only come if they provide a half-million dollar accountant to the district attorney's office to spearhead the investigation? Unfortunately, if the situation occurring here is repeated statewide, we will, in my view, be heading down a path in the administration of criminal justice with one tier for the wealthy and another one for those cities, schools, and special districts that, for whatever reason, do not have a substantial tax base.
My concerns do not stop with the less wealthy public entity. If prosecutors are entitled, as my colleagues seem to suggest, to compel a wealthy public entity to provide and pay for the use of an additional in-house investigator, what prevents them from wheedling the same from those in the private sector, or threatening to refuse to prosecute if the "necessary" expert is not provided. Large corporations and wealthy individuals will be able to obtain prosecutions simply by volunteering to pay an expert to investigate the matter on behalf of the prosecutor. Individuals of limited means, small companies, and nonprofit organizations may forgo asking for presentation of their claims, or simply may be turned down by the local prosecutor, because they cannot afford the costs.
We have entered an age where complex and sophisticated white collar crimes, many involving the use of computers and international financial institutions, are very expensive to investigate and prosecute. I have great empathy for the budget analyst in every public prosecutor's office in the country. Sooner or later, however, our *586 high courts must deal with these issues and our legislative bodies must address funding for the prosecution of the crimes committed with high-tech devices. Allowing prosecutors to assess victims for the cost of the investigation and prosecution of these complex crimes as a condition of presentation only undermines the credibility of our justice system. And, as we all know, "The authority of government prosecutions may be diminished if they are perceived as being exercised disproportionately on behalf of the wealthy." (Kennedy, supra, at p. 705; see also People v. Eubanks, supra, 14 Cal.4th at p. 593, 59 Cal.Rptr.2d 200, 927 P.2d 310.)
Judges are prohibited from accepting gifts of more than $250 in value. Politicians running in federal elections are limited to contributions of $1,000 per person. Our candidates for state and local elections must disclose all contributions in excess of $100. The rationale behind all of these laws is simplelarge contributions influence the decision-making process. These statutory limits and disclosure requirements were all enacted for the purpose of preventing influence from following the money. Are we now to adopt a double standard for the law enforcement process? If judicial officers are perceived to be subject to influencing with gifts of $250, are we so naive to believe that $300,000 will not taint the process?
I dissent. I would grant the petition and direct the trial court to enter a new order granting Hambarian's motion to recuse the Orange County District Attorney's Office.
NOTES
[1] Of course, if Franzen's compensation were tied to the outcome of the criminal proceeding, disqualification would be mandatory. (See People ex rel. Clancy v. Superior Court (1985) 39 Cal.3d 740, 218 Cal.Rptr. 24, 705 P.2d 347.) While the majority conclude on the record before us that his salary is not contingent upon a particular recovery, I emphasize the point in hopes of not having to address it later since a conviction in the criminal case would make recovery in the civil action a virtual certainty. But if it should ultimately come to light there was a contingent or percentage fee arrangement with the city, both the conviction (if that occurs) and any civil judgment will be jeopardized.
[2] The majority opinion gleefully quotes Presiding Justice Scotland's recent well-written opinion in People v. Parmar wherein he states that "disqualification of a prosecutor is not required merely because financial assistance has made prosecution economically feasible." (People v. Parmar (2001) 86 Cal.App.4th 781, 795, 104 Cal.Rptr.2d 31, petn. for review pending, petn. filed March 12, 2001.) It then notes that the authority for this statement is Eubanks. (Maj. opn. ante, at p. 575.)

So? Parmar dealt with the question of whether a class of victims may band together to fund a position within the district attorney's office to prosecute a particular type of crime affecting the class, but which may or may not directly affect one of its members. (See also Com. v. Ellis (1999) 429 Mass. 362, 708 N.E.2d 644, 649.) That is not this case. Moreover, Parmar made it clear that, unlike Eubanks, there was "no showing of the possibility of private-party influence upon the prosecutor, either directly or through institutional arrangements, and that is a factor of obvious significance in considering the necessity of disqualification." (People v. Parmar, supra, 86 Cal.App.4th at p. 796, 104 Cal.Rptr.2d 31.) Here we have both "private party influence" and "institutional arrangement."
[3] My colleagues chastise me for drawing what they see as unsupported conclusions from the facts in the record because they are contrary to their reading of the record and "they conflict with the trial court's presumed factual findings." (Maj. opn. ante, at p. 573.) Not only is their critique unfoundedthe record amply supports each statement madebut the apparent importance they place on it underscores the difference in the way we approach this matter.

My colleagues see this as a simple "abuse of discretion" case, and that so long as some facts in the record support the trial court's decision the petition should be denied. But where, as here, the relevant facts are undisputed (i.e., the city has effectively made a $300,000 contribution to the district attorney's office to prosecute this criminal proceeding), "we are concerned with the legal significance" of the facts, and "review the trial court's exercise of its discretion as a question of law in light of the pertinent legal principles. [Citation.]" (People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc. (1999) 20 Cal.4th 1135, 1144, 86 Cal.Rptr.2d 816, 980 P.2d 371.)
[4] The felony complaint charges him with 6 counts of grand theft (Pen.Code, § 487, subd. (a)); 11 counts of presenting false claims (Pen.Code, § 72); 1 count of commercial bribery (Pen.Code, § 641.3, subd. (a)); 2 counts of breach of fiduciary duty (Corp. Code, § 14085, subd. (a)); 3 counts of receipt of corporate property (Corp.Code, § 2255, subd. (a)); 14 counts of filing false tax returns (Rev. & Tax.Code, §§ 19705, subd. (a)(1) & 19706); and 28 counts of money laundering (Pen.Code, § 186.10, subd. (a)(2)).
[5] Prosecutors generally support the reasoning of the case. (See Trask, Comment Note: Post Eubanks and Insurers Funding Prosecutions in High Tech Cases (Jul./Aug. 1999) vol. 33, Prosecutor 36 ["The California District Attorneys Association, speaking for California prosecutors, has stated there is little quarrel with the fact that private corporations should not pay for prosecutions outside of authorized statutory and constitutional basics"]; cf. Nahra, The Role of Victims in Criminal Investigations and Prosecutions (Jul./Aug. 1999) vol. 33, Prosecutor 28, 30, fn. 21 [National Prosecution Standards provide that prosecutors must avoid situations in which they have a substantial financial tie to a case].)

So do most commentators. (See Kennedy, Private Financing of Criminal Prosecutions and the Differing Protections of Liberty and Equality in the Criminal Justice System (1997) 24 Hastings Const. L.Q. 665, 670 (hereafter Kennedy) [thesis of article is that, "Private financing in any of its likely forms threatens equality of treatment by potentially biasing the prosecutor in favor of the contributors. Such a practice sacrifices the equality of the prosecutor's choices in order to enlist the financial support of victims who have both a direct interest in the prosecution and the money to further that interest."]; Note, The Trial Court Did Not Abuse Its Discretion When It Found That An Alleged Victim's Payments to the District Attorney's Office for Investigation Costs Created a Conflict of Interest that Allowed for Recusal of the District Attorney's Office: People v. Eubanks (1997) 25 Pepperdine L.Rev. 256.
One student note, however, takes a minority view, apparently on the theory that rich people should have to pay for prosecutions when they are the victims. (See Note, The Public Interest and Private Financing of Criminal Prosecutions (1999) 77 Wash. U. L.Q. 1343, 1344 ["This Note argues not only that public control can coexist with private financing, but that a private financing system, if properly structured, could advance egalitarian values by offsetting institutional influences that lead the prosecutor to distribute criminal justice resources inequitably"].)
[6] Apparently concerned that Eubanks might inadvertently cause courts to disqualify prosecutors whenever the victim had provided assistance to them, an unsuccessful effort was made in 1999 to amend subdivision (a) of Penal Code section 1424 to insulate prosecutors from disqualification in those situations. The proposed amendment provided: "The fact that a crime victim or other person presented information to the district attorney, including information in the form of the results of investigations, the reports, opinions, or conclusions of experts, or equipment furnished to the district attorney for the purpose of viewing or analyzing evidence, shall not constitute grounds for disqualification. The fact that a crime victim or other person incurred costs in obtaining that information and presenting it to the district attorney also shall not constitute grounds for disqualification." (Assemb. Bill No. 154 (1999 Reg. Sess.) Jan. 15, 1999.) The amendment did not become part of the enrolled bill. (See Stats. 1999, ch. 363, § 1, p. 2215.)
[7] My discussion is limited to Hambarian's claim that the decision to ensconce Franzen in the district attorney's office impaired the prosecutor's impartiality. The motion to recuse also argued the participation of Nakada and the Arthur Andersen firm in the investigation created a disabling conflict. It was asserted, for example, that Arthur Andersen has an interest in the successful prosecution of this case because when it was hired it had several clients actively trying to buy Hambarian's company, and after evidence of fraud was found one of its clients bought the company for 25 cents on the dollar. But the "evidence" was nothing more than innuendo and, as my colleagues conclude, on those grounds the motion was properly denied.
[8] Although not briefed or argued, this case also raises a serious separation of powers question. May the district attorney's office (which is part of the executive branch) whose budget is set by the board of supervisors (which is part of the legislative branch) end run the appropriation process by accepting what we all agree is effectively a $300,000 contribution? (Cf.Gov.Code, § 26504.)